PETTIGREW, J.
|2In this medical malpractice case, the defendants appeal the trial court’s entry of a judgment notwithstanding the jury’s verdict (JNOV) and its conditional grant of a motion for a new trial in favor of the plaintiffs. For the following reasons, we reverse that judgment and reinstate the jury’s verdict, together with the judgment of October 20, 2014, rendered in accordance with the jury’s verdict.
FACTUAL AND PROCEDURAL BACKGROUND
David Pitts, Jr. and Kenyetta Gurley filed a petition against Dr. Rhoda Renee *224 Jones and Louisiana Medical Mutual Insurance Company (“LAMMICO”), alleging that ,Dr. Jones - breached the applicable standard of care in her treatment of their seven-month-old daughter, Lyric Pitts, resulting in Lyric’s untimely death. After extensive discovery, the case was tried to a jury on September 23-26, 2014. On September 26, 2014, the jury answered as follows to the jury interrogatories:
1. Did plaintiffs prove the standard of care ordinarily exercised by emergency medicine physicians under circumstances similar to this case? YES.
2. Did plaintiffs prove that Dr. Jones failed to comply with the emergency medicine standard of care in her treatment of the patient? NO.
The jury was polled, confirming their verdict by a vote of 9-3, and the verdict was made the judgment of the trial court in a written judgment signed by the trial court on October 20,2014.
The plaintiffs filed a motion for a JNOV and a motion for a new trial. After a hearing. on January 26, 2015, the trial court granted the motion for JNOV and rendered judgment in. favor of the plaintiffs in the amount of $560,000.00, plus judicial interest until paid, and all court costs. The trial court also conditionally granted the motion for new trial in favor of the plaintiffs. The judgment was signed January 30, 2015.
Because the trial court granted the JNOV and awarded damages above the statutory .cap of $100,000.00 for qualified health care providers as provided in La. R.S. 4Q;1299.42(B)(2), the Louisiana Patient’s Compensation Fund and Louisiana Patient’s Compensation Fund Oversight Board (collectively, the “Board”) became involved in the | ^appeal as a matter of law.[1] LAMMICO, Dr. Jones and the Board filed suspensive appeals of the judgment, assigning error to the trial court’s grant of the JNOV and its conditional grant of a new trial. The plaintiffs answered the appeal, asserting that in the event that the JNOV or the conditional grant of a new trial is not affirmed on appeal, the jury verdict is manifestly erroneous and should be reversed on its merits based on the evidence presented at trial. The plaintiffs further argued that the judgment appealed from should be modified in part in accordance with La. R.S. 40:1299.47(M) to provide that “all of the foregoing sums are to bear judicial interest from the date that the Complaint was filed with the Division of Administration until paid.”[2]
ANALYSIS.
A-plaintiffs burden in a medical malpractice case against a physician is to prove by a preponderance of the evidence the three elements set forth in La. R.S. 9:2794(A), which states, in pertinent part:
A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The. degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the *225 plaintiff has the burden of proving the degree of care ordinarily practiced by physicians .. within the involved medical specialty. ■
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
|4These elements can be summarized in the context of this case as requiring the plaintiffs to prove: (1) the standard' of care applicable to Dr. Jones in her practice as an emergency room physician; (2) Dr. Jones’s breach of that standard of care; and (3) the causal relationship between that breach and the injuries sustained by the plaintiffs. The jury verdict in this case was that the plaintiffs failed to prove that Dr. Jones breached the standard of care in her treatment of Lyric. Therefore, the jury’s answer to this question required the trial court to enter judgment dismissing the plaintiffs’ case.

Judgment Notwithstanding the Verdict

A JNOV is a procedural device authorized by La. Code Civ. P. art. 1811, by which the trial court may modify the jury’s findings to correct an erroneous jury verdict. Wood v. Humphries, 2011-2161, p. 4 (La.App. 1 Cir. 10/9/12), 103 So.3d 1105, 1109, writ denied, 2012-2712 (La.2/22/13), 108 So.3d 769. Article 1811 states, in pertinent part:
A.(1) Not later than seven days, exclusive of legal holidays, after the clerk has mailed or the sheriff has served the notice of judgment under Article 1913, a party may move for a judgment notwithstanding the verdict...
(2) A motion for a new trial may be joined with this motion; or a new trial may be prayed for in the alternative.
B. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or render a judgment notwithstanding the verdict....
C. (1) If the motion for a judgment notwithstanding the verdict is granted, the court shall also rule on the motion for a new trial, if any, by determining whether It -should be granted if the judgment is' thereafter vacated or reversed and shall specify the grounds for granting or denying the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.
(2) If the motion for a new trial has been conditionally granted and the judgment Is reversed on appeal, the new trial shall proceed unless the appellate court -orders ’ otherwise.
Article 1811 does not set Out the criteria to be used when deciding a motion for JNOV. Wood, 2011-2161 at 5, 103 So.3d at 1110. However, the Louisiana Supreme Court has established the standard to be used in determining whether a JNOV is legally called for, stating:
| BJNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one. party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there-is a preponderance of evidence for the mover. The motion should be denied-if. there is evidence opposed to the motion which is of such quality and *226 weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that “[w]hen there is a jury, the jury is the trier of fact.”
Joseph v. Broussard Rice Mill, Inc., 2000-0628, pp. 4-5 (La.10/30/00), 772 So.2d 94, 99 (citations omitted).
In a case such as this, the trial court must first determine whether the facts and inferences point so strongly and overwhelmingly in favor of the plaintiffs that reasonable jurors could not arrive at a contrary verdict. Stated simply, if reasonable persons could have arrived at the same verdict, given the evidence presented to the jury, then a JNOV is improper. Cavalier v. State, Dept, of Transp. and Development, 2008-0561, p. 14 (La.App. 1 Cir. 9/12/08), 994 So,2d 635, 644.
An appellate court reviewing a trial court’s grant of a JNOV employs the same criteria used by the trial court in deciding whether to grant the motion. See Smith v. State, Dept, of Transp. and Development, 2004-1317, p. 13 (La.3/11/05), 899 So.2d 516, 525. In other words, the appellate court must determine whether the facts and inferences adduced at trial point so overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary finding of fact Id. If the answer is in the affirmative, then the appellate court must affirm the grant of the JNOV. Id. However, if the appellate court determines that reasonable minds could differ on that finding, then the trial court erred in granting the JNOV, and the jury verdict should be reinstated. Id.
Therefore, our initial inquiry is whether the evidence at trial so overwhelmingly supported the plaintiffs on the breach of the standard of care issue that reasonable jurors could not have concluded that, the plaintiffs failed to establish that Dr. Jones fibreached the standard of care in her treatment of Lyric. If so, then the trial court was correct in granting the JNOV. However, if reasonable jurors in the exercise of impartial judgment might conclude from the evidence that the plaintiffs failed to establish that Dr. Jones breached the applicable standard of care in her treatment of Lyric, then the trial court erred in granting the motion, and the jury’s verdict should be reinstated. See Gutierrez v. Louisiana Dept, of Transp. and Development, 2011-1774, p. 9 (La. App. 1 Cir. 3/23/12), 92 So.3d 380, 386, writ denied, 2012-1237 (La.9/21/12), 98 So.3d 343. Neither the trial court nor this court may substitute its evaluation of the evidence for that of the jury, unless the jury’s conclusions totally offend reasonable inferences from the evidence. Id.
The facts of this case were developed for the jury by several witnesses testifying on behalf of both the plaintiffs and the defense. Lyric’s parents, Kenyetta Gurley and David Pitts, Jr., each gave their account of what happened leading up to Lyric’s death. Kenyetta testified that on October 22,2011, she and David took Lyric to a birthday party for a friend’s child. According to Kenyetta, Lyric vomited once on the way to the party and once again at the party. Kenyetta also indicated that Lyric was breathing a little faster than normal, guessing that this had been going on for about two hours.
Kenyetta’s twitter account contained several entries from the day in question. At 3:26 p.m., Kenyetta’s tweet says, “It looks like I’m gonna be headed to the ER.” *227 At 3:28 p.m., she tweeted, “My pumkin not feeling good.” However, according to Kenyetta, on her way home from.the party, she stopped to vote and went to her mom’s house, before heading to the hospital around 3:45 p.m. •
Kenyetta testified- that Dr. Jones told her that Lyric may have asthma and that she was going to give her some breathing treatments. She only recalled seeing Dr. Jones twice during the four hours they spent in the emergency room. At some point while in the emergency room, someone other than Dr. Jones attempted to start an intravenous line (“IV”) on Lyric but was unsuccessful. The decision was then made by Dr. Jones to admit Lyric for overnight observation at the hospital.
| ./Kenyetta indicated that while she .did not recall Lyric having any more large vomiting episodes once they were at the hospital, Lyric spit up twice, once in the emergency room and once after they were admitted to the hospital room. Kenyetta described Lyric’s breathing as “hard.” Not long after they were in the room, David joined them at the hospital. Ken-yetta testified that the nurses eventually called Dr. Jones to the room because Lyric’s breathing, was “out of whack.” According to Kenyetta, when Dr. Jones entered the room, she. tried to feed Lyric a bottle, but never picked Lyric up out of the bed. As Dr. Jones was attempting to feed the baby, the bottle fell, and Lyric “went stiff.” Dr. Jones asked Kenyetta if there was a history of seizures in her family. After that, medical personnel started coming in, and she and David were asked to leave the room. While waiting in the hall, Kenyetta and David called family members to join them at the hospital. Kenyetta indicated that no one, including Dr. Jones, ever came out of the room to get them or tell them anything about what was going on with Lyric or that Lyric had died. It was only after some time that Kenyetta went back into the room to discover that, in fact, Lyric had passed away. Kenyetta stated that when she picked her child up, Lyric “gasped for air,” giving Kenyetta one moment of hope that maybe Lyric was still alive. However, a nurse told her that was trapped air and that Lyric was gone.
David testified that when he got to the hospital," Kenyetta and Lyric were already in the room. He stated that when he first saw Lyric, she looked distraught and was breathing hard. David relayed the same sequence of events to the jury as Kenyetta about what happened when Dr. Jones came into the room to check on Lyric. He indicated that after Lyric passed away, neither Dr. Jones nor any of the nurses ever said they were sorry.
Also testifying for the plaintiffs was Sara Sisung, a registered nurse employed by Hood Memorial Hospital. Nurse Si-sung was the person who checked the crash cart list on October 1, 2011, and initialed the list, indicating that all of the required items, including a small straight blade and a small curved blade, were in the cart at that time. However, Nurse Sisung acknowledged that she was not on duty on October 22, 2011, and had no personal knowledge of the events that took place during the code in question. | «Moreover, although she testified that the code chart is checked daily to see if the defibrillator is working and it is locked, Nurse Sisung testified that the chart that was in evidence was a monthly chart and only verified that the crash cart had been inventoried on October 1,2011.
Dr. Jones testified as to her recollection of what transpired the night Kenyetta brought Lyric into the hospital for treatment. Not only was Dr. Jones the only physician who actually examined Lyric on the night in question, but she was the only *228 medical personnel from Hood Memorial called by either side to testify regarding any of the events that occurred on the night1 in question. Dr, Jones stated that even before she examined Lyric, a triage nurse had- assessed Lyric’s level of acuity as “low level.” The triage nurse also reported that Lyric was wheezing and had vomited once before arriving at the hospital. According to Dr. Jones, she met with Kenyetta and examined Lyric, who acted appropriately during the exam. She found Lyric to be tired but a little playful, with no signs of dehydration, good circulation, normal heart sounds, and wheezing, in the lungs.
At that point, Dr. Jones started a “workup” on Lyric and ordered a CBC (a blood' test used to detect things like infection and anemia), a CMP (a comprehensive metabolic profile used to measure electrolytes), a chest X-ray, and a RSV test (respiratory syncytial virus test). Dr. Jones stated that the CBC was normal, the RSV test was normal, and the CMP was never done because the machine in the hospital was broken. With regard to the chest X-ray, Dr. Jones indicated that although it showed a tiny infíltrate, that finding had no special significance to her. Nothing else on the X-ray was abnormal; there was no enlargement of the heart and no fluid around the pericardium. Based on all of the information she had, ie., the lab work, the X-ray, and the patient exam, Dr. Jones believed Lyric had an asthma exacerbation and decided to admit her for observation. Dr. Jones ordered nebulizer treatments, antibiotics, and steroids. Dr. Jones noted that nothing in Lyric’s history, test results, or assessment supported a diagnosis of myocarditis. There' was no indication of “any type of heart problems at all.” Dr. Jones stated that Lyric’s vital sign's were stable and in line with what she would expect to see in a seven-13month-old infant presenting to the emergency room for treatment for asthma. Moreover, Dr. Jones did not observe any labored breathing when she examined Lyric.
According to Dr. Jones, the entire time Lyric was in the emergency room, no nurse ever expressed any concerns about Lyric’s condition. In fact, even after Lyric was admitted to the second floor, Dr. Jones indicated that all of the feedback from the nurses was that Lyric was doing fíne. It was not until around 2:00 or 2:30 a.m. that Dr. Jones was called and told that Lyric was not doing well. Dr. Jones >vas asked about the late entry in Lyric’s chart by a nurse wherein it is suggested that Dr. Jones was asked at least three times if another facility should be called.[3] Dr. Jones stated that the note was not in the chart when she reviewed it and that she was never asked by any nurse to transfer Lyric to another facility. Dr. Jones indicated that she has respect for nurses, noting that her sister is a nurse. Dr. Jones added although she did not see *229 any basis for transferring Lyric to another facility, if a nurse had suggested it, she would have taken it into consideration. She stated that as a physician, she believes she is part of a team, and she would have at least thought about it if it had been suggested. Dr. Jones opined that this was a case of sudden infant death syndrome (“SIDS”), indicating that after autopsy, myocarditis is determined to be the cause of death in a third of all SIDS .cases.
Dr. Jones also testified at length about her efforts to resuscitate Lyric during the code. She stated that when she initially got into the room, there was a nurse trying to start an IV on Lyric’s foot. After multiple attempts, Lyric was crying and upset. Dr. Jones was under the impression that the IV had already been done, as she had included an IV in the admit orders for Lyric. At that point, Dr. Jones told the nurse not to stick Lyric |10anymore because she was going to put an intraosseous (“10”) line in through the bone. Dr. Jones picked Lyric up to console her, and' as she was holding Lyric, the baby stiffened and started having seizure activity. Dr. Jones called for the crash cart and immediately started chest compressions. She put an 10 line in Lyric, and tliey hooked leads up to Lyric to monitor her heart rhythm. According to Dr. Jones, Lyric was in ventricular fibrillation rhythm (“V-Fib”) very briefly and then converted into pulseless electrical activity (“PEA”), a non-shockable rhythm. They kept pushing epinephrine and ran the code for over forty minutes, but the monitor continued to show a flat-line, and Lyric was pronounced dead. Dr. Jones also stated that after it was all over, she spoke with Kenyetta and David, expressing her sympathy for their loss and saying that she was hopeful that they would eventually know what caused Lyric’s death.
When asked about the preferred method of oxygenation for a case like this-, Dr. Jones testified that while intubation is a good method, it is not always the best method' depending on the patient; She stated that the focus is on delivering oxygen. Dr. Jones indicated that she did not intubate Lyric because the crash cart had the wrong type and size of laryngoscope blades. She testified that for this seven-month-old patient, she needed a “Miller 1” straight blade. Dr. Jones stated that Lyric’s oxygen saturation level was never anything less than it should be during the period of time that she was bag-valve masked. There was a pulse oximeter .indicator on Lyric throughout the entire code showing Dr. Jones that Lyric’s oxygen saturation levels never went below 95 percent.
Dr. Jones was adamant that her care of Lyric was reasonable and appropriate both in the emergency room'and once the baby was admitted to the floor. She stated that everyone -involved did everything they could to save Lyric. Dr. Jones testified that if a baby presents with a problem of cardiac origin, the emergency medicine standard of care would require her to call a specialist. However, if a baby presents like Lyric did, with a problem appearing to be respiratory in nature such as asthma, the emergency medicine standard of care would not require a consult with a specialist as this would be a disease that is routinely treated by an emergency room physician.
InDr. James Andrew Crowell, III, board certified in emergency medicine with almost 40 years of practice, was the first expert witness called by the plaintiffs. He was one of the three members of the medical review panel who reviewed the case. Dr. Crowell stated that the panel’s opinion was that Dr. Jones had breached the standard of care in her treatment of Lyric. *230 All three physicians on the medical review panel agreed that Lyric was very sick when she presented to the hospital. Dr. Crowell pointed to evidence in the record that showed Lyric was lethargic (“listless, weak ... sick looking”), tachycardic (Lyric’s heart rate was elevated), and tachyp-neic (Lyric’s breathing was labored) when she was initially seen. The panel further opined:
The child was [quite] ill and this was not recognized in a timely manner throughout her ED stay and hospitalization. The child was rapidly decompensating and resuscitation was not aggressively undertaken. [Dr. Jones] should have transferred the child to a facility providing a higher level of care and expertise.
The panel cannot determine what role these breaches in the standard of care played in the child’s demise. Panel defers to the expertise of a pediatric inten-sivist or pediatric cardiologist for that determination.
However, on cross-examination, Dr. Cro-well admitted that while a heart rate of 189 for a patient of this age would be considered the upper limits of normal, it was not something that would “raise a red flag” for him. According to the evidence in the record, Lyric’s heart rate during the entire time she was under Dr. Jones’s care was at or under 189.[4] Dr. Crowell admitted further that any oxygen saturation level above 95 percent would be considered “quite adequate.” Dr. Crowell contended that Lyric’s high oxygen saturation numbers were the result of the baby working hard to breathe the entire time she was under the care of Dr. Jones. However, Dr. Crowell was then presented with the nursing notes for the pertinent time period showing that Lyric consistently had even and unlabored breathing, no nasal flaring, and had no acute distress. Dr. Crowell admitted that the nursing notes “suggested] nothing untoward [going] on,” showed no “unusual [ 12work of breathing” to maintain good saturation levels, and did not show what the members of the panel had described as “rapidly decompensat-ing.”
Asked whether other emergency medicine physicians may disagree with him regarding whether Dr. Jones breached the standard of care in treating Lyric, Dr. Crowell responded, “Oh, absolutely, we can disagree on anything.” Dr. Crowell added, “[another physician] may understand what the standard of care is, he may just decide from looking at the records that [Dr. Jones] didn’t breach it.”
Dr. Crowell was re-called as a rebuttal witness for the plaintiffs. He testified that it was the role of an emergency room physician to recognize when a patient is sick and get them to where they can be treated. Regarding the late entry in Lyric’s medical chart indicating that a nurse had inquired at least three times about transferring Lyric, Dr. Crowell added, “You’ve got the nurses pleading with you to transfer the kid, that’s in the record, and that’s what we look at. That’s important.” However, Dr. Crowell acknowledged that he did not know if any nurse had been called to testify regarding this information.
The next expert witness to testify for the plaintiffs was Dr. Lloyd Gueringer, Jr., another member of the medical review panel who was also board certified in emergency medicine. Dr, Gueringer’s testimony overlapped with that of Dr. Cro-well. He testified that upon presentation, *231 Lyric’s respiratory rate and heart rate were arguably within the normal range, though at the upper limits of normal. Dr. Gueringer further acknowledged that until around 2:00 a.m., Lyric’s temperature, heart rate, oxygen saturation, respiratory rate, and blood pressure were “not the picture of an abnormal seven-month-old infant.” Rather, until approximately 2:00 a.m., Dr. Gueringer agreed that all of Lyric’s vital signs were consistent and within normal limits, not at all representative of a rapid decompensation as found by the panel members. Dr. Gueringer also concurred with Dr. Crowell’s position that other emergency medicine physicians may disagree with him on the outcome of this case.
Dr. Bradley Scott Marino, board certified in pediatrics, pediatric cardiology, and pediatric critical care medicine, also testified on behalf of the plaintiffs as an expert in |13those areas. The plaintiffs did not tender Dr. Marino as an expert in the field of emergency medicine, nor was he accepted by the trial court as an expert in that field. Diming voir dire cross-examination, the following colloquy occurred:
Q. And of course when you have to fill out your application for privileges at the various hospitals at which you have privileges and for insurance purposes you don’t list yourself as an emergency medicine physician, correct?
A. That’s correct.
Q. And you are not a member of the American College of Emergency Physicians, ACEP
A. That is correct.
Q. Or the American Academy of Emergency Medicine, AAEM?
A. That is correct.
Q. Or SAEM, Society for Academic Emergency Medicine?
A. ... Yes, sir, you’re correct.
Q. And you’re — my point is, is that while you may be eminently qualified as a pediatric cardiologist and as a pediatric intensive medical care specialist, you’re not telling the jurors today that you’re going to be offering standard of care testimony about what an emergency medicine physician has to do down in the ER before he or she decides to call the pediatric cardiologist or the pediatric intensive care medicine specialist, correct?
A. I cannot comment as a front line provider, but,. relative to the symptoms and signs of what a patient with acute myocarditis — fulminant myocarditis might present with, I am indeed an expert.
[[Image here]]
Q. Thank you. I just wanted clarification on the boundaries of what your expert testimony is going to be, understood?
A. Yes, sir.
Dr. Marino authored the 2010 Pediatric Advanced Life Support Guidelines (“PALS”), which provides a national standard for resuscitation of pediatric patients. Dr. Marino testified that this case was about “failure to rescue.” He indicated that when Lyric initially presented in the emergency room, there was a window of opportunity to transfer her to a higher level of care for treatment, and that was not done. He added that if Lyric had been transferred to a higher level of care in those first several hours [14after she arrived in the emergency room, her chance of survival would have been 75 to 80 percent.
With regard to resuscitation, Dr. Marino criticized several things that Dr. Jones did during Lyric’s code. He argued that according to PALS, Dr. Jones should have shocked Lyric with a defibrillator while she was in V-Fib, in an attempt to restore *232 the rhythm to normal sinus rhythm. The following colloquy occurred regarding Lyric’s code:
■ Q.* And nothing was called, in your opinion, [early] enough to resuscitate and rescue the baby?'
■ A. No. And the most important thing here is the only thing you can do for a patient in ventricular fibrillation is shock them.
' So start CPR, if the rhythm is shocka-ble, which this was a shockable rhythm, shock them. Use CPR for two minutes. Is it shockable? Yes. Then shock them again. This whole arrest was run for almost an hour with not a single shock in it.
So the most basic rule of PALS, which is [if there’s] a shockable rhythm, you need to shock, was not done in this case. So there’s a failure to rescue in terms of transferring to a higher level of care, and there’s a failure to rescue when the child arrested doing the most basic thing we do in CPR, which is chest compressions, and if there’s a shockable rhythm, shock them,
Q. What happens if you don’t shock a shockable rhythm?
A. You’re not going to get them back. They’re going to die. And to put this bluntly, and I apologize for being so clear about this, I believe, it’s my expert opinion, that.when Dr. Jones did not elevate this' child to a higher-level of - care she signed this child’s death certificate. And when the child arrested and she didn’t appropriately resuscitate this patient, any chance ■ the • child had for survival was gone.
However, as discussed below, Dr. Jones testified that Lyric only experienced V-Fib for a few seconds before deteriorating into PEA. Dr. Marino acknowledged that once in PEA,. PALS no longer call for shocking the patient, but rather chest compressions and the- administering of epinephrine, which, as set forth in detail below, is.exactly what Dr. Jones did during the code. Dr. Marino further criticized Dr. Jones for using bag-mask ventilation rather than intubation during Lyric’s code. He acknowledged, .however, that when properly, performed, bag-mask ventilation can be as effective as ventilation through an endotracheal tube for short periods and may be safer.
hsWith regard to Lyric’s vital signs during the course of her treatment, Dr. Mari-no testified that they were concerning' and should have alerted Dr. Jones to call for a transfer. Dr. Marino claimed that the maximum normal heart rate for a seven-month-old baby was 169, He was asked to look at Lyric’s recorded heart rates of 189, 187, and 180, and opined that they were all elevated because théy were over 169. He further noted that as a child gets older, the heart rate, falls.- However, when Dr. Mari-no was presented with excerpts from the PALS Provider Manual, authored by him, that stated the normal heart rates for an infant, between three months to two years old is 100 to 190, Dr. Marino claimed the document was “not meant to be a scientific document.” And he later added on redirect that when he and his colleagues began preparing the new PALS Guidelines for 2015, he was going to suggest that they flip the numbers to make it clear’ that 190 is for a three-month old and 100 is for a two-year old.
Dr. Marino was subsequently asked about the opinions given by the plaintiffs’ own expert witnesses, Dr. Crowell and Dr. Gueringer, concerning Lyric’s heart rate being in the “high range of normal.” Maintaining his position that Lyric was clearly sick when she came into the emerr gency department and that she should have been transferred to a; higher level of care, Dr. Marino stated, “I would not ex *233 pect these emergency physicians to know the subtleties of a heart -rate , of [130] to [160] or [180]. That heart rate is much higher than normal for a child who’s seven months of age.”
Dr. Randall Craver, board certified in clinical and anatomic pathology and pediatric pathology, was the first expert witness called by the defense. Dr. Craver reviewed approximately ten tissue slides prepared in conjunction with Lyric’s autopsy, including tissue specimens taken from Lyric’s heart. He showed the jury blown-up pictures of Lyric’s heart as compared to that of a healthy heart, and noted that Lyric’s heart showed no signs of scarring, which meant that the injury to her heart was acute or short-term. Dr. Craver testified that over his 30 years of practice, he had never seen a case of myocarditis as “intense and ..'. extensive as this involving the entire thickness |1fiof the heart muscle wall.” He confirmed that these findings were consistent with sudden cardiac death.
Dr. Joseph S. Litner, a board certified emergency physician, testified for" the defense as a medical doctor with a specialty in emergency room medicine. Dr. Litner opined that Dr. Jones’s evaluation and treatment of Lyric complied with the applicable standard of care. After reviewing Lyric’s medical chart, including the history given by the mother, Dr. Litner indicated that Dr.’ Jones’s diagnosis of asthma/possible RSV was completely reasonable and that myocarditis did not belong in Dr. Jones’s differential diagnosis of Lyric; Dr. Litner noted that when Lyric initially presented at the hospital, she had-no fever, was wheezing, had an oxygen saturation level of 100 percent, a normal chest X-ray, and normal white blood- count. He testified that while Lyric’s chest X-ray showed a small infiltrate-in the lungs consistent with respiratory issues, Lyric’s heart was normal size, there was no pulmonary edema, and there were no signs of congestive heart failure.
Dr. Litner pointed out the lack of support in the record for the medical review panel’s characterization of Lyric as “significantly tachycardic and tachypnea” upon presentation • to the hospital. Moreover, Dr. Litner stated that Lyric was not “quite ill” or «rápidly decompensating” until around 2:00 a.m., at which time aggressive attempts at'resuscitation were taken. Dr. Litner also disagreed with the medical'review panel’s opinion that Lyric should have been transferred to another facility, noting that based" on how Lyric presented, she could have been managed quite easily in a community hospital.'
. Dr. Litner opined that. Dr. Jones’s attempts at resuscitation and CPR on Lyric were appropriate. He went on to say that bag-mask ventilation is an accepted method of ventilation and that it has become increasingly favored. It. allows a physician ■to achieve ventilation without interrupting CPR. Dr. Litner then demonstrated for the jury with a mannequin and a bag mask how quickly bag-mask ventilation can be accomplished. He concluded by saying that an unsuccessful code does not Indicate | ^substandard care on Dr. Jones’s part, noting “about 80 or 90 percent of codes unfortunately are unsuccessful.”
The final expert witness to testify on behalf of the defense was Dr. John. Brein-holt, who was board certified in pediatrics and pediatric cardiology. Based on what Dr. Breinholt reviewed, he believed Lyric presented to the emergency room with bronchiolitis. Dr. Breinholt saw no indication in the records that this was a child with a problem of a cardiac origin. He further indicated there was no evidence in Lyric’s records that would have warranted or mandated that she be transferred from *234 the emergency room to another facility by Dr. Jones.
Dr. Breinholt opined that the code on Lyric was run appropriately. He agreed that bag-mask ventilation was appropriate because it allowed for uninterrupted chest compressions. Dr. Breinholt further testified that based on the circumstances and the fact that Lyric was deteriorating quickly from V-Fib into PEA, the guidelines called for chest compressions and epinephrine, which is exactly what was done in this case. He agreed with Dr. Litner that just because a code fails, does not mean a physician has breached the standard of care. When asked to comment on Dr. Marino’s statement that by the method and manner in which she had treated Lyric, Dr. Jones had “signed the infant’s death certificate,” Dr. Breinholt stated, “I don’t agree with that. I actually find that a disappointing way to refer to a case like this.... I think that’s a very inflammatory sound bite more than it is a professional opinion about a situation, and it’s rather offensive I think considering what’s at stake.”
In ruling on the JNOV, the trial court stated:
The jury just got it totally wrong in this case. I am of the opinion that they were completely confused as to the applicable standard of care of an emergency room physician at a semi-rural hospital. The medical review panel was crystal clear with their unanimous assessment that the defendant physician was not under any obligation to properly diagnose with precision the specific illness or Alnesses with which the child presented. The physician’s Primary obligation was simply to recognize a very sick infant, and to immediately refer and transfer the child to a facility where proper care could be given. Under any scenario or interpretation of the facts, this the physician did not do. The medical records powerfully support that the child was very ill upon presentation based on the vital signs, documentation of nausea, vomiting, labored respira-tions, lethargy, loss of appetite and lack of eating, lack of drinking 11sand lack of elimination which continued during the entire hospital stay. The emergency room nurse documented that on at least three occasions she urged the defendant physician to transfer the child to a higher care facility and the doctor failed to do so. This factor is very significant, considering the reluctance of inferior medical personnel to question the decision of any physician, much less three times in an emergency room setting. Instead, the defendant physician arrogantly admitted the child to her own grossly incompetent care. This unequivocal breach of standard of care caused prolonged suffering to the child and the death of the child. The child possessed a greater than fifty percent chance of survival at the time of presentation to the emergency room. The parents, and certainly not the child, committed no act of contributory or comparative fault. The damages awarded are on the low end herein, but are within the realm of discretion.
No reasonable jury could have found otherwise than as stated herein. I [believe] the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant.
After reviewing the evidence in this case, we are forced to disagree with the trial court’s conclusion that “[n]o reasonable jury could have found otherwise than as stated” in the trial court’s reasons for judgment. The jury was presented with conflicting expert testimony concerning Dr. Jones’s treatment of Lyric and wheth *235 er it constituted a breach of the standard of care. The experts who testified on behalf of the plaintiffs, two of whom were on the original medical review panel, opined that Dr. Jones breached the standard of care in her treatment of Lyric; the physicians testifying on behalf of Dr. Jones did not agree. The experts also disagreed on whether Lyric’s condition was such that she should have been transferred by Dr. Jones immediately upon presentation to the emergency room. Again, while the experts testifying for the plaintiffs described Lyric as “quite ill” and “rapidly decompensating,” Dr. Litner indicated that he found no evidence in the record warranting a transfer of Lyric to another facility for treatment. Given the considerable disagreement among the medical experts, a reasonable person could have concluded that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial. Therefore, we conclude that the trial court’s granting of the motion for a JNOV constituted legal error and must be reversed. See Wood, 2011-2161 at 13-14, 103 So.3d at 1116.
| xJMotion for New Trial
Under Article 1811(C)(1), if the trial court grants a JNOV, it must also rule on whether a new trial should be granted in the event the appellate court vacates or reverses the JNOV. The trial court must also specify the grounds for the grant or denial of the motion for a new trial. In this case, the trial court stated as follows in conditionally granting a new trial:
I [believe] the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice which must be remedied. A JNOV is designed to protect against arbitrary and unreasonable and biased juries, and is a proper vehicle to render justice herein. If not, then certainly a new trial is warranted.
Therefore, the trial court satisfied the requirements of Article 1811(C)(1). According to Article 1811(C)(2), if the motion for a new trial has been conditionally granted and the JNOV is reversed on appeal, the new trial shall proceed unless the appellate court orders otherwise. Therefore, we must consider whether the conditional granting of the motion for a new trial was appropriate in this case.
As provided in La. Code Civ. P. art.1972, a new trial shall be granted, upon contradictory motion, where (1) the verdict or judgment appears clearly contrary to the law and evidence; (2) important evidence is obtained after trial; or (3) the jury was either bribed or behaved improperly. These provisions constitute the peremptory grounds'for granting a motion for new trial. Pursuant to La. Code Civ. P. art. 1973, a new trial may be granted if there is good ground for it, except as otherwise provided by law. This article provides the trial court with discretionary authority to grant a new trial.
The standard of review of a judgment on a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. See Magee v. Pittman, 98-1164, p. 19 (La.App. 1 Cir. 5/12/00), 761 So.2d 731, 746, writs denied, 2000-1694, 2000-1684 (La.9/22/00), 768 So.2d 31, 602. The breadth of the trial court’s discretion to order a new trial varies with the facts and circumstances of each case. Horton v. Mayeaux, 2005-1704, p. 11 (La.5/30/06), 931 So.2d 338, 344; LnWhen the trial court grants a new trial *236 based on Article 1972⅛ mandatory ground of a jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court abused its discretion in granting a new trial. Martin v. Heritage Manor South, 2000-1023, p. 15 (La.4/3/01), 784 So.2d 627, 637.
‘ A motion for new trial requires a less stringent test than a motion for JNOV, as its determination involves Only the issue of a new trial and does not deprive the parties of their right to have all, disputed issues resolved by a jury. Law v. State ex rel Dep’t of Tramp, and Dev., 2003-1925, p. 7 (La.App. 1 Cir. 11/17/04), 909 So.2d 1000, 1006, writs denied, 2004-3154 and 2004-3224 (La.4/29/05), 901 So.2d 1062. Whether to grant a.new trial requires a discretionary balancing of many factors. Id. In deciding whether to grant a new trial, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and it may evaluate witness credibility to determine whether the jury erred in giving, too much credence to an unreliable witness. Joseph, 2000-0628 at 14-15, 772 So.2d at 104. A motion for new trial based solely on the ground of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Davis v. Wal-Mart Stores,, Inc., 2000-0445, p. 10 (La.11/28/00), 774 So.2d 84, 93, citing Gibson v. Bossier City Gen. Hosp., 594 So.2d 1332, 1336 (La.App. 2 Cir.1991).
The trial court in this case conditionally granted the new trial on the same grounds on which the JNOV was granted, namely, that the jury was confused by the testimony and applied the wrong standard of care to the defendants: The trial court found that the jury verdict was so far contrary to the law and the evidence that it offended the conscience and presented a clear injustice that must be remedied. Examining the trial court’s conclusion in the light of the peremptory and discretionary grounds for granting a motion, for new trial, it appears that the motion for new trial was |⅞1 granted because the jury verdict was contrary to the evidence presented by the plaintiffs concerning the standard of care and Dr. Jones’s treatment of Lyric. If that were the case, Article 1972 would mandate the granting of a new trial.
However, this court’s review,of the testimony of all the medical experts leads us to conclude that there was significant disagreement among them as to whether Dr. Jones breached the applicable standard of care, such that a reasonable juror could find that this element of the plaintiffs’ case had not been established. In a number of cases, courts have concluded that when a JNOV is reversed based on the appellate court’s determination that the jury’s verdict was reasonably supported by the evidence presented at trial, the alternative request for a new trial should also be denied or reversed on appeal. See Trunk v. Medical Center of Louisiana at New Orleans, 2004-0181, p. 11 (La.10/19/04), 885 So.2d 534, 540 (“Because we have previously concluded [in reversing the JNOV] that the jury’s verdict was reasonable in light of the evidence presented, we find that plaintiff-is not entitled to a new trial.”); Davis v. Witt, 2002-3102, p. 23 (La.7/2/03), 851 So.2d 1119, 1134 (“When any fair interpretation of the evidence supports the jury’s verdict, the grant of a new trial must be reversed.”); VaSalle v. Wal-Mart Stores Inc., 2001-0462, p. 18 (La.11/28/01), 801 So.2d 331, 342 (“Because *237 we have previously concluded [in reversing the JNOV] that the jury’s verdict is reasonable in light of the evidence presented, we find that plaintiffs are not entitled to a new trial.”); Yohn v. Brandon, 2001-1896, pp. 11-12 (La.App. 1 Cir. 9/27/02), 835 So.2d 580, 587, writ denied, 2002-2592 (La.12/13/02), 831 So.2d 989 (“As with the. supreme court in VaSalle, we have ‘corn eluded that the jury’s verdict is reasonable in light of the evidence presented,’ and [therefore,] the plaintiff was ‘not entitled to a new trial.’ ”); In re Gramercy Plant Explosion at Kaiser, 2004-1151, p. 17 (La.App. 5 Cir. 3/28/06), 927 So.2d 492, 502, writ denied, 2006-1003 (La.6/14/06), 929 So.2d 1271 (“[W]hen a JNOV is reversed on determination that the jury’s verdict was reasonable in light of the evidence presented, the conditional new trial also should be reversed.”).
Li>We find such reasoning is applicable to this case. In reversing the trial court’s grant of a JNOV, we determined that the evidence in the record supported the jury’s verdict that the plaintiffs had failed to prove that Dr. Jones breached the emergency medicine standard of care in her treatment of Lyric. We further found that the jury’s verdict was reasonable, given the diverse opinions expressed by the medical experts. Thus, the jury’s verdict was supportable by any fair interpretation of the evidence. See Davis, 2000-0445 at 10, 774 So.2d at 93. Therefore, the plaintiffs were not entitled to a new trial on the basis that the jury’s verdict was contrary to the law and the evidence.
Furthermore, our review of the record discloses no other grounds — peremptory or discretionary — upon which a motion for new trial could have been granted, See La. Code Civ. P.. arts.1972 and 1973. “A. conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur.” Joseph, 2000-0628 at 15, 772 So.2d at 105. Accordingly, we find that the trial court abused its discretion in conditionally granting the plaintiffs’ motion for a new trial.
CONCLUSION
For the above and foregoing reasons, the January 30, 2015 judgment of the trial court, granting a JNOV in favor of the plaintiffs and conditionally granting a new trial, is hereby reversed, and the jury’s verdict is reinstated, together with the October 20, 2014 judgment rendered in accordance with the jury’s verdict. All costs associated with this appeal are assessed to the plaintiffs, David Pitts, Jr. and Kenyet-ta Gurley.
REVERSED; JURY’S VERDICT REINSTATED; JUDGMENT OF OCTOBER 20, 2014 REINSTATED.
WELCH J., dissents without reasons.
McCLENDON, J., concurs and assigns reasons.
HIGGINBOTHAM, J), dissents with reasons.

. Louisiana Revised Statutes 40:1299.41 to 40:1299.49 were redesignated as La. R.S. 40:1231.1 to 40:1231.10 by HC.R 84, effective June 2,.2015. t ■

. Because we reverse the trial court’s grant of the JNOV and reinstate the jury’s- verdict herein, the issues raised by the plaintiffs in their answer to the appeal are rendered moot.

. We note that the entry, which is prefaced with the initials “LE” for late entry and an approximate time that is illegible as written, reads as follows:
ADON [Assistant Director of Nursing] Karen Volkman here, told ADON that Dr. Jones wants to admit pt., & I asked Dr, Jones at least 3X,if we could call another facility, Dr. Jones stated "No one will take pt. [with negative] labs & no fever” Dr. Jones told ADON POC, ADON states "OK, I can see that”.
As previously indicated, no other medical personnel with knowledge of the events in question were called to testily during the trial of this matter. Thus, there is no further explanation of this note from Lyric’s medical chart. Dr. Jones testified that she never saw the notation, nor was she ever asked by a nurse to transfer Lyric to another facility for treatment.

. We note a discrepancy in the chart at 10:35 p.m. concerning Lyric's heart rate. Lyric's pulse is recorded as 187 for this time in 2 different places in her chart, while in another place in the chart, her pulse is recorded at 200.