WEIMER, J.,
concurring in part and dissenting in part.
11While I concur in that portion of the majority opinion that affirms the court of appeal’s ruling reversing the district court’s grant of a judgment notwithstanding the verdict (“JNOV”), I respectfully dissent from the majority’s conclusion that the district court did not abuse its discretion in granting a conditional new trial. Finding, on the basis of the differing opinions expressed by the medical experts, that the jury’s verdict was supportable by any fair interpretation of the evidence, I would reverse the district court’s grant of a conditional new trial and affirm the judgment of the court of appeal in its entirety.
At the outset, it must be acknowledged that this is truly a tragic case. However, our role as an appellate court is not to be swayed by emotion or compassion,[1] but to resolve the matters before us on the law and the facts as applied to that law. In this ■ case, that law is well-settled. As reflected in the instructions received by the jury:
The standard of care owed by a physician is not to exercise the highest degree of skill and care possible. ... The failure to obtain satisfactory results by a physician does not give rise to any presumption that there has been any malpractice on the part of the physician. The law 12does not require perfection in medical diagnosis and treatment. On the contrary, a physician’s professional judgment and conduct must be evaluated in terms of reasonableness under the existing circumstances, and should not be viewed in hindsight and in terms of results or in light of subsequent events. ... A physician is not obligated in making a diagnosis to be correct.all the time, and it is not malpractice to misdiagnose a patient’s condition, ... What the law requires is that the assessment made by Dr. Jones be within the sphere, of reasonably possible diagnoses that should have been made by other physicians under similar circumstances.
Armed with these instructions, a jury comprised of the peers of the parties heard the testimony, observed the witnesses, and came to’ a difficult decision. That decision should be respected. Unfortunately, there is sufficient evidence in the record to éstablish that Lyric died from a rare and often fatal heart condition that masquerades as an upper respiratory or gastrointestinal disease.and is not reasonably detectable until after death, through an autopsy.
*74 The issue with which this court must grapple is whether a new trial should be granted on the particular facts and circumstances of this case. As the majority recognizes, a new trial may be granted on peremptory, La. C.C.P. art. 1972, or discretionary, La. C.C.P. art. 1973, grounds. In this case, the district court did not specify on which of the grounds-peremptory or discretionary-the court relied in granting the conditional new trial; rather, “the district court provided essentially the same reasons for granting the JNOY and conditionally granting the new trial.” Pitts v. Louisiana Medical Mutual Insurance Company, 16-1232, slip op. at 9 (La. 3/14/17), 218 So.3d 58, 65-66, 2017 WL 1041228. Those reasons reflect the district court’s assessment that the jury verdict “is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice that must be remedied.” Id. Giving the broadest possible construction to these reasons, it is likely, as the majority concludes, that the district court found a new trial warranted | sunder both the peremptory ground of La. C.C.P. art. 1972(1) (“[w]hen the verdict ... appears clearly contrary to the law and the evidence”) and the discretionary ground of La. C.C.P. art. 1973 (when “there is good ground therefor”).
Although the district court has wide discretion to grant or deny a motion for new trial on either of these grounds, this court has repeatedly cautioned that this discretion is not unlimited:
The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury’s responsibility.
Martin v. Heritage Manor South, 00-1023, p. 3 (La. 4/3/01), 784 So.2d 627, 630 (quoting Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La.App. 2 Cir. 1991)). This is particularly true when the ground asserted for granting a new trial is that the verdict appears contrary to the evidence:

A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence.

Martin, 00-1023 at 3, 784 So.2d at 630-31 (quoting and adding emphasis to Gibson, 594 So.2d at 1336).
In this case, the district court itself acknowledged during the hearing on the motions for JNOV and a new trial that, while he would have decided the case differently, this is in fact a case in which the jury verdict is supportable by a fair interpretation of the evidence. Commenting on the standard for granting a JNOY, the district court candidly admitted: “And yet, the defense put on expert witnesses who 14gave opinions that the standard was not breached and that because of that-I mean, I think you see my point. If the jury believed, for whatever reason, those witnesses, whom I can tell you I did not believe, they had something to hang their hat on.”
The majority opinion does not disagree with this conclusion, adopting in full the court of appeal’s determination that “[g]iv-en the considerable disagreement among *75 the medical experts, a reasonable person could have concluded that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial.” Pitts, 218 So.3d at 65 (quoting Pitts v. Louisiana Medical Mutual Insurance Company, 15-0848, p. 18 (La.App. 1 Cir. 6/3/16), 197 So.3d 221, 235). Nevertheless, despite acknowledging that (1) the standard for a new trial under La. C.C.P. art. 1972(1) directs that the reviewing court determine whether the jury’s verdict is supportable by any fair interpretation of the evidence, Pitts, 218 So.3d at 66, and (2) given the differing opinions voiced by the medical experts, reasonable persons could have concluded that plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones, Pitts, 218 So.3d at 64-65, the majority finds no abuse of discretion in the district court’s grant of a conditional new trial. However, it does so after examining only the trial testimony favorable to the plaintiffs, without examining, and basically dismissing, the considerable testimony to the contrary on which a reasonable juror could have relied in reaching the verdict in this case. For example, the majority opines:
It is undisputed that the standard of care simply required Dr. Jones to recognize Lyric presented to the emergency room as a sick baby and to transfer her to a higher level care facility. As confirmed by the unanimous opinion of the MRP[2] and the testimony of Drs. Cro-well, UGueringer and Marino, the medical records undoubtedly support a finding that Lyric presented to the ER “quite ill.”
Pitts, 218 So.3d at 70-71. This conclusion ignores significant testimony which undercuts that of the plaintiffs’ experts, including testimony from the plaintiffs’ experts themselves.
Dr. Crowell, plaintiffs’ first expert to testify, was one of three members of the medical review panel (“MRP”) who reviewed the case. While Dr. Crowell based his opinion (and that of the MRP) on evidence indicating that on arriving at the emergency room, Lyric was lethargic, ta-chycardic (displaying an elevated heart rate) and tachypneic (having difficulty breathing), on cross-examination, he admitted that Lyric’s heart rate of 189 (which was never exceeded during the entire course of her treatment), while at the upper range of normal, was not something that would “raise a red flag.” See Pitts, 15-0848 at 11, 197 So.3d at 230. Her oxygen saturation level, which was always above 95 percent, was admittedly “quite adequate.” Id. And, while Dr. Crowell initially attributed the “adequate” oxygen saturation level to the work Lyric was exerting in trying to breathe, after reviewing the nursing notes indicating that Lyric had no nasal flaring, had even and unla-bored breathing, and showed no signs of acute distress, Dr. Crowell admitted that the nursing notes “suggested] nothing untoward” going on, showed “no unusual work of breathing,” and demonstrated none of the rapid decompensation that had been discussed in the MRP’s opinion. Id., 15-0848 at 11-12, 197 So.3d at 230. Dr. Crowell further acknowledged that Lyric’s documented respiratory rates were within normal range the entire time she remained *76 in the emergency room. Significantly, as the court.of appeal notes in its opinion:
. Asked whether other emergency medicine physicians may disagree with him regarding whether Dr. Jones breached the standard of 16care in treating Lyric, Dr. Crowell responded, “Oh, absolutely, we can disagree on anything.” Dr. Cro-well added, “[another physician] may understand what the standard of care is, he may just decide from looking at the records that [Dr. Jones] didn’t breach it,”
Pitts, 15-0848 at 12, 197 So.3d at 230 (emphasis added).
Similarly, Dr. Gueringer, another member of the medical review panel, was called to testify as an expert for plaintiffs. Dr. Gueringer’s testimony overlapped with much of the testimony offered by Dr. Cro-well. Dr. Gueringer testified that when she presented to the hospital, Lyric’s respiratory and heart rates were arguably within normal range. He elaborated, explaining that--Lyric’s temperature, pulse or heart rate, oxygen saturation levels, respiratory rate, and blood pressure-at least until 2 a.m.-did.not present “the picture of an abnormal seven-month-old infant.” Pitts, 15-0848 at 12, 197 So.3d at 231. In fact, he acknowledged that until 2 a.m., all of Lyric’s vital signs were normal, consistent, and not at all representative of the rapid de-compensation found by the MRP members. Most significantly, Dr. Gueringer concurred with Dr. Crowell’s position that other emergency medicine physicians might disagree with his conclusions in this case.
. Finally, Dr. Marino was called by the plaintiffs to testify as an expert, not. in emergency medicine, but in pediatrics, pediatric cardiology, and pediatric critical care medicine. On direct examination, Dr. Marino testified that Lyric’s vital signs were abnormal, and should have prompted Dr. Jones to call for her transfer to a hospital that could provide a higher level of care. However, his testimony to this effect was based on his opinion that the maximum normal heart rate for a seven-month-old baby is 169. Dr. Marino reviewed Lyric’s recorded heart rates of 189, 187, 187, and 180 and opined that they were all abnormally elevated because they were over 169. On cross-examination, however, Dr. Marino was presented with excerpts from theJjPediatric Advanced Life Support (“PALS”) manual, which he authored, which indicates that the normal heart rate for an infant between three months and two years of age is 100 to 190. In other words, according to the manual Dr. Marino himself wrote, Lyric’s heart rate was normal at all relevant times. Dr. Marino’s testimony was thus contradicted by his own manual, considered to be the national standard. Further, when asked about the opinions of plaintiffs’ experts, Drs. Crowell and Gueringer, that Lyric’s vital signs were within normal ranges, Dr. Marino stated, “ I would not expect these emergency physicians to know the subtleties of a heart rate of [130] to [160] or [180],” thereby directly, undermining his earlier criticism of Dr. Jones for not recognizing what he perceived to be abnormal pediatric vital signs. Pitts, 15-0848 at 15, 197 So:3d at 232-33.
If reasonable experts in emergency medicine might not be expected.to recognize, based on her vital signs, that Lyric presented to the emergency room as a “quite ill” child (per Dr. Marino), or might disagree with the conclusions of plaintiffs’ experts that Dr. Jones breached the applicable standard of care (per Drs. Crowell and Gueringer), then, certainly, the district court’s grant, of a new trial on the ground that the verdict is clearly contrary to the evidence is an abuse of discretion. This is true without even considering the testimo *77 ny of defendants’ experts, but a cursory review of that testimony underscores that, as the district court noted, the jury “had something to hang their hat on.”
In fact, Dr. Litner, who testified for clefendants as an expert in emergency medicine, opined that Dr. Jones fully complied with the appropriate standard of care. He disagreed with the opinion of the MRP,[3] pointing out that the panel’s Ischaracterization of Lyric as “significantly tachycardic and tachypneic” was not supported by her actual vital signs. Pitts, 15-0848 at 16, 197 So.3d at 233. He disagreed with the panel’s opinion that Lyric was “quite ill” on presentation and that Dr. Jones failed to recognize the seriousness of her condition, and he disagreed with the opinion that Lyric should have been transferred to another facility,, explaining that based on how she presented, she could have been managed in a community hospital.
Dr. Breinholt, a pediatrician and pediatric cardiologist, likewise testified as an expert witness for defendants. He testified that upon presentation in the emergency room, Lyric looked like a child with a typical respiratory illness like bronchiolitis, reactive airway disease or asthma, and not like a child with a cardiac problem. He indicated there was no evidence in Lyric’s medical records that would have warranted or mandated that she be-transferred to another facility.
While the majority seems to place a great deal of emphasis on the late added entry to Lyric’s medical records by a nurse, which suggests that Dr. Jones was asked at least three times if another facility should be called, the fact is that much about this entry was disputed. Dr. Jones testified she never saw the entry, nor was she ever asked by a nurse to transfer Lyric to another facility for treatment. She explained that she has respect for nurses. She stated that as a physician, she believes she is part of a team and that she would have at least considered the, idea of a transfer if a nurse had suggested it. The nurse who is reported to have made the entry was not called to testify and, in fact, the only witness who testified to the events of that day was Dr. |9Jones,[4] Given that Dr. Jones was the only fact witness to testify, it was not unreasonable, as the majority suggests, for the jury to have given weight to her testimony. The fact that Dr. Jones disputed that a suggestion to transfer Lyric was made in her presence does not render her testimony in that regard incredible.
In the final analysis, the jury verdict in this case was based on the testimonies of several highly qualified experts, including Drs. Litner and Breinholt. The jury’s decision to credit the opinion of those experts was supported by the testimony of plaintiffs’ own experts, Drs. Crowell and Guer-inger, who acknowledged that it is reason *78 able for experts to disagree as to whether Dr. Jones breached the applicable standard of care in this case. And, it was further supported by Dr. Marino’s admission that he would not expect emergency room physicians to understand the subtleties of an abnormal heart rate in a child Lyric’s age. The jury’s verdict in this case was clearly based on a fair interpretation of the evidence and, while the district court was free to draw his own inferences and conclusions from the evidence and to evaluate witness credibility to determine whether the jury erred in giving too much credit to an unreliable witness, the court was not free to interfere with the jury verdict simply because the court disagreed with it. To the extent the district court’s grant of a conditional new trial was based on the court’s conclusion that the jury verdict “is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned),”[5] that ruling was an abuse of discretion. A fair interpretation of the evidence does not support the district court’s finding that a new trial is warranted under La. C.C.P. art. 1972(1).
|inOf course, as the majority recognizes, the district court also has authority to grant a new trial on the discretionary grounds of La. C.C.P. art. 1973. However, and also as recognized by the majority, while a district court has much discretion to grant a new trial when the court is convinced that a miscarriage of justice has occurred, the district court is nevertheless required to state an articulable reason as to why he is exercising his discretionary power. Pitts, 218 So.3d at 66-67, citing Horton v. Mayeaux, 05-1704 (La. 5/30/06), 931 So.2d 338, 344.
In this case, as the majority acknowledges, the same reasons that prompted the district court to grant the JNOV prompted him to grant the conditional new trial. According to the district court:
No reasonable jury could have found otherwise than as stated herein. I belief (sic) the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice that must be remedied. ...
Pitts, 218 So.3d at 63-64
Reduced to its essentials, the only reason cited by the district court for the grant of a conditional new trial is its disagreement with the evidence and the manner in which the jury evaluated that evidence. Tellingly, there is no explanation from the district court as to why the court was convinced the jury was confused by the defense experts as to the applicable standard of care, other than the district court’s belief that because the jury credited the defense testimony, it must have been confused. Thus, this is not a case like Horton, where the district court granted a new trial on the discretionary grounds of La. C.C.P. art. 1973 because it was concerned about a failing on its own part to conduct the trial in a manner that assured that justice had been |ndone.[6] Rather, in this case, the district court simply failed to articulate a ground for the granting of a new trial other than its disagreement with the jury’s verdict. This is not the “good *79 ground” for interfering with the jury’s verdict that is contemplated by La. C.C.P. art. 1973. As this court has cautioned, “[a] conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur.” Joseph v. Broussard Rice Mill, Inc., 00-0628, p. 15 (La. 10/30/00), 772 So.2d 94, 105. No such facts appear in the record of this case.
Based on the facts in this case, I find no peremptory or discretionary grounds on which the district court could have based its conditional grant of a new trial. As a result, I would affirm the court of appeal opinion in its entirety.

. In this regard, the district court's gratuitous characterization of Dr. Jones as “arrogant” and “grossly incompetent” in his written reasons adds little to the dispassionate discourse that is necessáry in evaluating evidence. See Pitts v. Louisiana Medical Mutual Insurance Company, 16-1232, (La. 3/14/17), 218 So.3d 58, 62-63, 2017 WL 1041228.

. It should be noted that while the medical review panel opined that Dr. Jones failed to meet the appropriate standard of care, it could not determine if any breach was a factor in Lyric’s demise. The MRP opinion states:
"The panel cannot determine what role these breaches in the standard of care played in the child’s demise.” Pitts, 15-0848 at 11, 197 So.3d at 230.

. The law is clear, and the majority does not dispute, that the opinion of the MRP, even a unanimous one, is not unassailable. See La. R.S. 40:1231.8(H) (formerly La. R.S. 40:1299.47(H)) (“Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness.”). See also Samaha v. Rau, 07-1726, p. 15 (La. 2/26/08), 977 So.2d 880, 890 (“As with any other expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing view point.”).

. The failure of the plaintiffs to call the nurse to testify did not go unobserved. Even the district court was perplexed as to why the nurse was not called. In a bench conference, the judge queried: “Am I ever going to know what happened to that nurse? I’m just dying with curiosity.”

. See Pitts, 218 So.3d at 63-64.

. In Horton, the district court expressed concern with its repeated admonishments to counsel to hurry and finish the case because of the late hour and further opined that the jury had been "pushed to the max.” Horton, 05-1704 at 10, 931 So.2d at 344.