FOR IMMEDIATE NEWS RELEASE

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **15th day of March, 2017,** are as follows:

**BY JOHNSON, C.J.:**

2016-C-1232     DAVID PITTS JR. AND KENYETTA GURLEY v. LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY AND RHODA RENEE JONES, M.D. (Parish of Tangipahoa)

For the above reasons, we affirm the ruling of the court of appeal setting aside the district court's grant of the JNOV. However, we reverse the ruling of the court of appeal relative to the new trial and we reinstate the district court's grant of the plaintiffs' motion for new trial.

AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.

WEIMER, J., concurs in part and dissents in part and assigns reasons.
GUIDRY, J., concurs and assigns reasons.
CLARK, J., concurs in part and dissents in part for reasons assigned by Justice Weimer.
CRICHTON, J., additionally concurs for the reasons assigned by Justice Guidry.

03/15/17

SUPREME COURT OF LOUISIANA

No. 2016-C-1232

DAVID PITTS JR. AND KENYETTA GURLEY

VERSUS

LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY
AND RHODA RENEE JONES, M.D.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF TANGIPAHOA

**JOHNSON, Chief Justice**

This medical malpractice case arises from the tragic death of Lyric Pitts, seven month old daughter of plaintiffs, David Pitts, Jr. and Kenyetta Gurley. Following trial of this matter, the jury found in favor of defendant, Dr. Rhoda Jones. Plaintiffs moved for a Judgment Notwithstanding the Verdict ("JNOV"), or alternatively for a new trial. The district court granted the JNOV and conditionally granted the new trial. The court of appeal reversed and reinstated the jury's verdict. We granted plaintiffs' writ application to review the correctness of the lower courts' rulings on the JNOV and new trial. For the following reasons, we affirm the court of appeal's ruling reversing the district court's grant of the JNOV. However, we reverse the ruling of the court of appeal relative to the new trial, finding no abuse of discretion in the district court's grant of a new trial.

## FACTS AND PROCEDURAL HISTORY

Kenyetta Gurley brought her only child, seven month old infant daughter Lyric Pitts, to the Emergency Room ("ER") at Hood Memorial Hospital on October 22, 2011, at approximately 6:20 p.m. reporting Lyric had thrown up twice that

1

afternoon and had rapid breathing; she was breathing "funny" and faster than normal. Lyric was triaged about 6:45 p.m. The chief complaints noted on the "Triage and Assessment" sheet in the medical records were "nausea and vomiting since 4 p.m., also wheezing." Her pulse rate was recorded at 189. The triage nurse also noted Lyric's skin as "dry" and "warm;" and noted "wheezes" in lungs; and "labored" respirations.

Lyric was examined in the ER at approximately 7:30 p.m. by defendant, Dr. Rhoda Jones, who noted shortness of breath and noted Ms. Gurley reported rapid breathing for 12 hours.[1] Dr. Jones' notes reflect Ms. Gurley was concerned so she brought the baby in and. Upon examination of Lyric, Dr. Jones noted "wheezing in all lung fields" and "shortness of breath." Dr. Jones ordered a chest x-ray, CBC (complete blood count), CMP (comprehensive metabolic panel) and a test for RSV (respiratory syncytial virus). She recorded her diagnosis in the medical records as "asthma/possible RSV/possible pneumonia." The "History and Physical Form" reflects the chief complaint upon presentation was "shortness of breath." Further abnormal findings of "lethargy, wheezing in all lung fields and dry skin" were noted. The findings/diagnosis were noted as "asthma possible pneumonia and RSV." According to the hospital's intake and output record, Lyric had not had any liquid intake since 4:00 p.m. and had no output (i.e., dirty diaper) since 2:00 p.m.

According to the medical records, Lyric received a steroid injection at 8:05 p.m and was given a dose of Phenergan for nausea at 8:10 p.m. At 8:28 p.m., Lyric was sent to have the chest x-ray taken. The nursing assessment records indicate at 8:40 p.m Lyric's pulse rate was 187 and respiration rate was 38. No nasal flaring was

---

[1] According to Ms. Gurley's testimony, the period of time was 2 hours, rather than 12 hours.

2

noted, but course breath sounds were noted in her lungs. Blood was drawn at 9:25 p.m., and the lab report was received at 10:00 p.m. A late entry to the medical records was added by a nurse indicating that an IV was attempted on Lyric with no success at 8:15 p.m. Additionally, at 10:25 p.m., Lyric was given a breathing treatment of Xopenex as well as an intramuscular shot of an antibiotic. The medical records also contain a late entry by the triage nurse indicating that at approximately 10:10 p.m. "ADON (assistant Director of Nursing) Karen Volkman here. Told ADON that Dr. Jones wants to admit pt., & I asked Dr. Jones at least 3x if we could call another facility, Dr. Jones stated 'no one will take pt. [with negative] labs & no fever.'.... ADON states 'Ok, I can see that.'"

The chest x-ray was normal, other than a tiny right lower lobe interstitial infiltrate.[2] Lyric's heart size was normal. The test for RSV was negative. Dr. Jones admitted Lyric to the hospital at approximately 10:35 p.m. for observation and breathing treatments every six hours. The diagnosis remained asthma and possible pneumonia. At 10:35 p.m., Lyric's pulse rate was recorded at 200 with respirations at 38. Nursing notes indicate the child was asleep; respirations were even and unlabored with audible coarse breath sounds; left lung field sounds coarse; right lung field sounds diminished; no nasal flaring noted; mother advised child had not drunk any milk since 4:00 p.m. and had not had a wet or dirty diaper since 2:00 p.m. The nurses noted no acute distress and indicated they would continue to monitor the child.

The medical records further indicate that at 11:30 p.m. a nurse called Dr. Jones questioning the need for a blood culture per hospital policy for diagnosis of pneumonia. Dr. Jones stated her "primary diagnosis is asthma with only possible

---

[2] According to trial testimony, an infiltrate could be anything; possibly a pneumonia.

pneumonia. If I wanted blood cultures done I would have ordered it."

At midnight, a nurse was called to the room by Ms. Gurley who reported that Lyric had thrown up. The nurse noted in the chart that a small amount of clear to white saliva was noted over mothers shirt. Respirations were noted as even and unlabored; no acute distress noted. The mother was assisted to a shower and a hospital gown was supplied. At 12:45 a.m., the nurses noted another episode of spitting up a small amount, approximately 25 ml, of clear saliva. At 2:00 a.m. a nebulizer treatment was administered. The nurses notes also indicate a change in Lyric's condition. Her respiration rate was recorded at 68 and the nurses noted she was moaning with every respiration; her breathing was noted to be "tacky" (i.e., fast).

By 2:30 a.m., Dr. Jones was called and she arrived in the room at approximately 2:40 a.m. The records reflect that at approximately 3:00 a.m., while Dr. Jones was holding Lyric, the child had seizure activity and stopped breathing. Dr. Jones called for the code cart and attempted to resuscitate the baby. At 3:51 a.m., the child was pronounced dead. The autopsy report showed the cause of death as myocarditis (inflammation of the heart muscle).

Plaintiffs instituted a medical malpractice action against Dr. Jones. The plaintiffs asserted Dr. Jones breached the standard of care for emergency room physicians because she failed to recognize Lyric was a "sick baby" and transfer her to a facility with a higher level of care.[3]

The Medical Review Panel ("MRP") unanimously found Dr. Jones failed to meet the standard of care, reasoning:

The child presented, as documented in the record, as lethargic,

---

[3] Plaintiffs also asserted Dr. Jones failed to rescue Lyric by failing to properly run the code and properly resuscitate Lyric once she went into cardiac failure. Because we find no abuse of discretion in the district court's ruling based on the standard of care relative to transferring a patient, we need not address the issue of Dr. Jones' alleged negligence relative to her attempted resuscitation of Lyric.

4

significantly tachycardic and tachypneic. The child was quite ill and this was not recognized in a timely manner throughout her ED stay and hospitalization. The child was rapidly decompensating and resuscitation was not aggressively undertaken. She should have transferred the child to a facility providing a higher level of care and expertise. The panel cannot determine what role these breaches in the standard of care played in the child's demise. Panel defers to the expertise of a pediatric intensivist or pediatric cardiologist for that determination.

The case proceeded to a jury trial, following which the jury ruled in favor of defendant by a vote of 9-3. Specifically, the jury found plaintiffs proved the standard of care, but failed to prove a breach of that standard. Pursuant to the instructions on the jury interrogatories form in light of the jury's negative response to the interrogatory regarding whether plaintiffs proved Dr. Jones failed to comply with the standard of care, the jury did not reach the subsequent questions of causation or damages.

Plaintiffs filed a motion for judgment notwithstanding the verdict or alternatively for a new trial. Following a hearing, the district court granted the JNOV and alternatively conditionally granted a new trial. In written reasons for judgment, the district court stated:

> The jury just got it totally wrong in this case. I am of the opinion that they were completely confused as to the applicable standard of care of an emergency room physician at a semirural hospital. The medical review panel was crystal clear with their unanimous assessment that the defendant physician was not under any obligation to properly diagnose with precision the specific illness or illnesses with which the child presented. The physician's primary obligation was simply to recognize a very sick infant, and to immediately refer and transfer the child to a facility where proper care would be given. Under any scenario or interpretation of the facts, this the physician did not do. The medical records powerfully support that the child was very ill upon presentation based on the vital signs, documentation of nausea, vomiting, labored respirations, lethargy, loss of appetite and lack of eating, lack of drinking and lack of elimination which continued during the entire hospital stay. The emergency room nurse documented that on at least three occasions she urged the defendant physician to transfer the child to a higher care facility and the doctor failed to do so. This factor is very significant, considering the reluctance of inferior medical personnel to question the decision of any physician, much less three times in an

emergency room setting. Instead, the defendant physician arrogantly admitted the child to her own grossly incompetent care. This unequivocal breach of standard of care caused prolonged suffering to the child and the death of the child. The child possessed a greater than fifty per cent chance of survival at the time of presentation to the emergency room. The parents, and certainly not the child, committed no act of contributory or comparative fault. The damages awarded are on the low end herein, but are within the realm of discretion.

No reasonable jury could have found otherwise than as stated herein. I belief [sic] the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice which must be remedied. A JNOV is designed to protect against arbitrary and unreasonable and biased juries, and is a proper vehicle to render justice herein. If not, then certainly a new trial is warranted.

The court of appeal reversed. *Pitts v. Louisiana Medical Mut. Ins. Co.*, 15-0848 (La. App. 1 Cir. 6/3/16) 197 So. 3d 221. After citing the law on JNOV and summarizing the evidence and testimony at trial, the majority stated:

After reviewing the evidence in this case, we are forced to disagree with the trial court's conclusion that "[n]o reasonable jury could have found otherwise than as stated" in the trial court's reasons for judgment. The jury was presented with conflicting expert testimony concerning Dr. Jones's treatment of Lyric and whether it constituted a breach of the standard of care. The experts who testified on behalf of the plaintiffs, two of whom were on the original medical review panel, opined that Dr. Jones breached the standard of care in her treatment of Lyric; the physicians testifying on behalf of Dr. Jones did not agree. The experts

6

also disagreed on whether Lyric's condition was such that she should have been transferred by Dr. Jones immediately upon presentation to the emergency room. Again, while the experts testifying for the plaintiffs described Lyric as "quite ill" and "rapidly decompensating," Dr. Litner indicated that he found no evidence in the record warranting a transfer of Lyric to another facility for treatment. Given the considerable disagreement among the medical experts, a reasonable person could have concluded that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial. Therefore, we conclude that the trial court's granting of the motion for a JNOV constituted legal error and must be reversed.

*Id.* at 234-35. The court of appeal similarly found no basis to support the conditional grant of a new trial:

> In reversing the trial court's grant of a JNOV, we determined that the evidence in the record supported the jury's verdict that the plaintiffs had failed to prove that Dr. Jones breached the emergency medicine standard of care in her treatment of Lyric. We further found that the jury's verdict was reasonable, given the diverse opinions expressed by the medical experts. Thus, the jury's verdict was supportable by any fair interpretation of the evidence. Therefore, the plaintiffs were not entitled to a new trial on the basis that the jury's verdict was contrary to the law and the evidence.

*Id*. at 237 (internal citations removed). Judge McClendon concurred, stating "while I may agree with the trial court's interpretation of the evidence, in light of the rigorous standard in reviewing a JNOV, I am constrained to find that the JNOV was improperly granted. Further, with regard to the motion for new trial, based on the totality of the evidence presented, I am unable to conclude that the jury's verdict was not supported by any fair interpretation of the evidence." *Id*. Judge Welch dissented without reasons and Judge Higginbotham dissented, stating "my review of the record

reveals the jury was confused and applied the wrong standard of care to the emergency room doctor. Thus, I would affirm the JNOV ruling." *Id*. at 238.

Plaintiffs filed a writ application in this court, which we granted. *Pitts v. Louisiana Medical Mutual Insurance Company*, 16-1232 (La. 11/15/16), --- So. 3d ---- .

## DISCUSSION

A JNOV is a procedural device authorized by La. C.C.P. art. 1811, by which the trial court may modify the jury's findings to correct an erroneous jury verdict. *Wood v. Humphries*, 11-2161 (La. App. 1 Cir. 10/9/12), 103 So. 3d 1105, 1109, *writ denied*, 12-2712 (La. 2/22/13), 108 So. 3d 769. The criteria for granting a JNOV was jurisprudentially provided by this court in *Scott v. Hospital Serv. Dist. No. 1*, 496 So. 2d 270 (La. 1986). More recently, this court summarized the standard for a JNOV in *Joseph v. Broussard Rice Mill, Inc.*, 00-0628 (La. 10/30/00), 772 So. 2d 94:

> As enunciated in *Scott*, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact."

772 So. 2d at 99 (internal citations removed). On appellate review of a JNOV, the court must first determine whether the trial judge erred in granting the JNOV by using these criteria in the same way as the trial judge in deciding whether to grant the motion. *VaSalle v. Wal-Mart Stores, Inc.*, 01-0462 (La. 11/28/01), 801 So. 2d

8

331, 339. "That is, the court must determine whether the 'facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict.' If reasonable persons might reach a different conclusion, then the trial judge erred in granting the motion and the jury verdict should be reinstated." *Id.*

Considering the rigorous standard for a JNOV and that the district court was not allowed to evaluate the credibility of the witnesses, after review of the record we find no error in the court of appeal's ruling setting aside the JNOV. As explained by the court of appeal, "given the considerable disagreement among the medical experts, a reasonable person could have concluded that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial." *Pitts*, 197 So. 3d at 235.

Although plaintiffs were not entitled to a JNOV, this does not necessarily preclude entitlement to a new trial. La. C.C.P. art. 1972 provides the peremptory grounds for a new trial: **(1) when the verdict or judgment appears clearly contrary to the law and evidence**, (2) when the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial, and (3) when the jury was bribed or has behaved improperly so that impartial justice has not been done. (Emphasis added). Additionally, La. C.C.P. art. 1973 provides the trial court with discretionary authority to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law." When the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice, a new trial should be ordered pursuant to La. C.C.P. art. 1973. *See Horton v. Mayeaux*, 05-1704 (La. 5/30/06), 931 So. 2d 338, 344; *Lamb v. Lamb*, 430 So. 2d 51, 53 (La. 1983).

In this case, the district court provided essentially the same reasons for

9

granting the JNOV and conditionally granting the new trial:

> I belief (sic) the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is **so far contrary to the law and the evidence that it offends the conscience** (certainly of the undersigned) **and presents a clear injustice which must be remedied**. A JNOV is designed to protect against arbitrary and unreasonable and biased juries, and is a proper vehicle to render justice herein. If not, then certainly a new trial is warranted. (Emphasis added).

Although not explicitly stated, the district court's reasons for granting a new trial can be reasonably construed as finding the verdict appears clearly contrary to the law and the evidence under Article 1972(1) and that there is a good ground therefor under Article 1973.

This court has explained that a motion for a new trial requires a less stringent test than for a JNOV as such a determination involves only a new trial and does not deprive the parties of their right to have all disputed issues resolved by a jury. *Martin v. Heritage Manor S. Nursing Home*, 00-1023 (La. 4/3/01), 784 So. 2d 627, 631. Unlike the standard applicable to a JNOV, in considering whether to grant a new trial under La. C.C.P. art. 1972(1), a trial judge may evaluate the evidence without favoring either party, and draw its own inferences and conclusions. *Id*. at 637. Most significantly, the district court has authority to evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. *Id*.; *Davis v. Wal Mart Stores, Inc*., 00-0445 (La. 11/28/00), 774 So. 2d 84, 93. However, because a motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations, the jury's verdict cannot be set aside on that ground if it is supportable by any fair interpretation of the evidence. *Id*.

The applicable standard of review in ruling on a motion for new trial is whether the district court abused its discretion. *Davis v. Witt*, 02-3102 (La. 7/2/03),

851 So. 2d 1119, 1131; *Martin*, 784 So. 2d at 632. In reviewing the district court's grant of a new trial under La. C.C.P. art. 1972(1), we are faced with the balancing of two very important concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. *Davis*, 774 So. 2d at 93. When the district court grants a new trial based on Article 1972(1), the jury verdict being contrary to the law and the evidence, the appellate court must review the record in view of the specific law or evidence found to conflict with the jury verdict to determine whether the trial court abused its discretion in granting a new trial. *Martin*, 784 So. 2d at 637. Furthermore, this court has recognized that the district court has much discretion in determining whether a new trial should be granted pursuant to Article 1973. *Lamb*, 430 So. 2d at 53; *see also* La. C.C.P. art. 1971, Official Comment (d). We have explained that, generally, "the only requirement has been that the district court state an articulable reason or reasons as to why he is exercising his discretionary powers." *Horton*, 931 So. 2d 338, 344 (internal citation removed). Unless an abuse of this discretion can be demonstrated, a district court's action in granting or denying a new trial on discretionary grounds will not be reversed. *Id*.

In reasons for judgment, the district court articulated the jury was "completely confused as to the applicable standard of care of an emergency room physician at a semirural hospital." As explained by the district court, and supported by the record, "the defendant physician was not under any obligation to properly diagnose with precision the specific illness or illnesses with which the child presented. The physician's primary obligation was simply to recognize a very sick infant, and to immediately refer and transfer the child to a facility where proper care would be given." The district court further explained that the medical records supported the fact that Lyric "was very ill upon presentation to the ER based on the vital signs,

documentation of nausea, vomiting, labored respirations, lethargy, loss of appetite and lack of eating, lack of drinking and lack of elimination which continued during the entire hospital stay." The court found it very significant that "the emergency room nurse documented that on at least three occasions she urged the defendant physician to transfer the child to a higher care facility and the doctor failed to do so." After review of the record, we find no abuse of the district court's discretion in granting a new trial under either Article 1972(1) or Article 1973.

As we previously explained, in considering whether to grant a new trial pursuant to Article 1972(1), the district court was permitted to weigh the evidence and make credibility determinations, and was not required to view the evidence in the light most favorable to Dr. Jones. It was undisputed at trial that the standard of care for an emergency room physician did not require Dr. Jones to diagnose Lyric with myocarditis. Rather, an emergency room physician is only required to recognize a "sick" patient and transfer the patient to a higher care facility. The primary issue at trial was whether Lyric presented as "sick," such that she should have been transferred to another facility.

Dr. James Crowell testified on behalf of the plaintiffs. Dr. Crowell served on the MRP and testified as an expert in emergency room medicine. According to Dr. Crowell, Lyric presented to the ER as lethargic, significantly tachycardic and tachypneic. He explained:

> "lethargic" implies a listless, weak energetic, just a sick looking presentation. Significantly tachycardic would mean the heart rate was fast, the baby's heart rate was higher than one would expect at rest. And tachypneic refers to the breathing of the baby, the baby's breathing hard, the heart rate's fast, and the baby looks listless, looks sick. Those three - - that description is just a sick baby if I were to describe it. The child was quite ill and this was not recognized in a timely manner and throughout her ... time in the Emergency room, or during her time during hospitalization.

Dr. Crowell opined that Lyric should have been transferred to a facility that provided

a higher level of care and expertise. Dr. Crowell further testified that the standard of care for an emergency medicine physician requires that the physician be aware this is a sick baby and the baby has been sick for hours—the physician does not have to diagnose the baby. He emphasized that the child's vital signs, taken alone, mean nothing. Rather, those numbers taken in conjunction with the whole picture of the child's presentation, gives the ER physician an idea of a clinical picture.

Dr. Lloyd Gueringer, another member of the MRP, testified on behalf of the plaintiffs as an expert in emergency medicine. He confirmed that the standard of care requires the physician to use skills to make an assessment—does someone really look ill or do they not. He opined that Dr. Jones failed to make that determination. Based on the medical records, Dr. Gueringer testified Lyric was tachycardic, although technically her numbers were in the high range of normal. He testified Lyric's breathing was labored and she demonstrated wheezing, indicating she was having difficulties and breathing at some expense. He opined these signs are indicative of a child that is having fairly significant difficulty and it has to be determined why. He emphasized the importance of looking at the overall picture of the child's presentation, and testified that the fact that Lyric was lethargic was a bad sign; that she was not eating and had no interest in feeding, along with some vomiting, alerts to dehydration. This presentation makes a physician suspect and alarmed that the child is compromised. Dr. Gueringer further opined that what Dr. Jones did was not what a normal ER physician would have done. That Lyric was lethargic, had an elevated heart rate, elevated respiratory rate, and had no fever, should have given Dr. Jones cause for concern. He testified the normal vitals numbers indicate the child was compensating. Other things such as lethargy, vomiting, elevated heart rate, no fever, not drinking—all together indicated the child was not doing well.

Dr. Bradley Marino, an expert in pediatric cardiology and pediatric intensive

critical care medicine also testified on behalf of the plaintiffs. Dr. Marino wrote the Pediatric Advanced Life Support ("PALS") guidelines, which provide clear directives on how to handle certain situations and provide national standards of how to resuscitate a pediatric patient. Dr. Marino testified that when a child has decreased urine output, decreased oral intake, has had vomiting, has wheezing, no fever, and a high heart rate of 200, you are concerned either the child is very dehydrated, has a lack of blood in the arteries and veins, or the child has a primary problem with the heart and the pump is not squeezing as well as it can normally, and as a result the heart rate is compensating by increasing to make sure the child is getting enough blood flow out to the body. He further testified that the fact that Lyric had no fever and a high heart rate "scares" him. He explained that if a child has a fever the heart rate would necessarily increase, but if there is no fever it is very concerning and unless you can prove that the child has significant dehydration, the problem has to be the heart. He testified that based on his review of the records, Lyric came into the ER in trouble. Dr. Marino testified regarding normal heart rate ranges, explaining that for 6-12 month olds, 108-169 is normal. He further explained that although the PALS guidelines shows normal heart rates by age, and in the stated age category of "3 months to 2 years" the normal rates set forth are 100-190, 190 is not intended for a 6-12 month old. Rather, that high of a rate would be normal for an awake 3-4 month old. He testified it is known and understood that the younger the child, the higher the heart rate. He also explained that as a baby ages, respiration rate, like the heart rate, also decreases. Thus, Lyric's respiration rate of 39 is on the high end of normal despite the PALS reference to 30-60 being the normal range. The stated PALS range would extend over the entire first year of life. Dr. Marino testified that classic findings in infant with heart failure are decreased feeding, vomiting, deceased urine output, tachycardia with no fever, and often wheezing from cardiac wheezing.

14

His opinion was that Lyric presented in classic fashion; appropriate testing was not done to identify myocarditis; and the child was not pushed to a higher level of care. Dr. Marino reiterated that the heart rate of 187, given no fever, in conjunction with wheezing, lethargy, not eating, drinking, peeing–all together created a clinical picture of a sick child with a need to be transferred. Dr. Marino opined that if Lyric had been properly assessed early, when she arrived at the Emergency Room, and then transferred to a higher level care facility, she would have had a 75-85% chance of survival.

Dr. Joseph Litner testified as an expert in emergency medicine on behalf of Dr. Jones. It was his opinion that Dr. Jones complied with the standard of care. Dr. Litner testified that Dr. Jones' diagnoses of asthma and possible pneumonia were reasonable based on the clinical presentation and x-ray. He stated that myocarditis would not be on a doctor's list of differential diagnoses based on the presentation. According to Dr. Litner, once Dr. Jones reached a respiratory diagnosis, it was her duty as an ER physician to treat that condition. Dr. Litner testified that Lyric's physical exam did not reveal anything out of the ordinary. Nebulization treatments with Xopenex, steroids, and antibiotics were appropriate treatments in his opinion. Additionally, Dr. Jones' decision to admit Lyric was appropriate and prudent. Dr. Litner testified that based on his review of the records and materials, his opinion was that Dr. Jones adequately assessed and adequately recognized the situation as Lyric presented to the hospital. Dr. Litner further testified that once Lyric was moved to the floor, there was almost a four hour period where there was no acute distress and it was not until about 2:00 a.m. that Lyric started to deteriorate. According to Dr. Litner, Lyric's vital signs were normal until about 2:48 a.m. He stated the records do not indicate respiratory distress. Dr. Litner disagreed with the MRP that Lyric presented tachycardic and tachypneic and disagreed that Lyric presented as "quite

15

ill." However, Dr. Litner acknowledged his prior deposition testimony wherein he testified a heart rate of 200 was slightly tachycardic, but then attempted to reduce the significance of this statement by associating the 200 heart rate with the administration of Xopenex. Dr. Litner also agreed on cross examination that Lyric presented to the ER as lethargic and he acknowledged that Dr. Jones' evaluation of Lyric noted she was lethargic. He further disagreed that Lyric was "rapidly decompensating," stating she was not decompensating until after 2:00 a.m. He testified there was no indication Lyric should have been transferred–she had normal vital signs and there was no obvious reason she could not be managed in a community hospital. Dr. Litner agreed on cross-examination that the job of an ER physician is to stabilize, treat and refer.

Dr. John Breinholt testified as an expert in pediatrics and pediatric cardiology on behalf of Dr. Jones. Based on his review of the records, he testified Lyric presented to the ER with some reactive airway disease, like bronchiolitis. The picture presented in the records is not a picture of a child with a problem of cardiac origin, but rather a child with a respiratory problem of some sort. Dr. Breinholt testified that from admission to 2:00 a.m., there was not much change in baby's condition; no evidence of a worsening condition or failure to respond to therapy. He did not see an indication for transfer during the ER stay or after admission. However, Dr. Breinholt agreed that Lyric presented tachycardic with rates in the 180s and that her heart rate remained elevated throughout her admission. Further, he stated that based on the mother's description that the child was breathing faster than normal, he would not dispute there was mild to moderate respiratory distress. He also agreed Lyric had some form of dehydration upon admission to the ER, although only mildly dehydrated. Although Dr. Breinholt testified that the mortality rate of infants with acute fulminant myocarditis can be as high as 75%, he also agreed that for children

16

with acute fulminant myocarditis, "one third will die, one third will survive and do just fine, and then the other third, they'll require medical therapy."

Defendant, Dr. Rhoda Jones, testified regarding her treatment of Lyric. Upon examining Lyric, she testified the child acted appropriately, and described the child as tired. She found no signs of dehydration, no heart murmurs, but she did hear wheezing. She ordered blood tests and a chest x-ray to make sure Lyric did not have pneumonia. She ordered a CBC to check for infection or anemia and a CMP to measure electrolytes, renal function. The chest x-ray was essentially normal and the CBC was normal. According to Dr. Jones, the CMP was not performed and was cancelled by the lab personnel because the machine was not working. She also ordered a test for RSV, which came back negative. She testified that based on the information she had (labs, x-ray, patient exam) she thought Lyric had asthma exacerbation and admitted her to the hospital for nebulizer treatments and observation overnight. Dr. Jones found all of Lyric's vital signs were in the normal range for a seven month old. She ordered a steroid and an antibiotic in addition to the nebulizer treatments. She did not order IV fluids for the baby because she stated Lyric was drinking Pedialyte. Dr. Jones testified she was advised about 2:00 a.m. that the baby was not doing well. When she walked into the room, the baby was crying and a nurse was trying to insert an IV in the baby. She told the nurse to stop and that she would place an IO (intraosseous) line  through the bone. Dr. Jones testified she had ordered an IV when she did the admission orders because this would be more comfortable for the baby than continuing IM (intramuscular) shots and she assumed the nurses had done the IV; she had not received a report of an unsuccessful IV  She picked up Lyric to try to console her before she did the IO; Lyric stiffened and starting having seizure activity; she laid Lyric down, called for the crash cart and started running the code (i.e., resuscitate the baby).

17

Dr. Jones testified that when Lyric was in the ER, she saw no basis to justify transferring her to another facility because the baby was in no apparent distress. Dr. Jones admits she did not order any additional lab tests or do another work up on Lyric. She admitted Lyric to the hospital for observation under her care. No orders were written to evaluate Lyric later in the evening or the next day. She testified she did not think it was necessary to write orders to follow up or evaluate the baby the next day.

However, relative to her assessment and treatment of Lyric, Dr. Jones' testimony conflicted with the medical records numerous times, calling her credibility into question. For example, Dr. Jones admitted she assessed Lyric as "lethargic" but tried to minimize that finding by testifying what she meant when she wrote lethargic: "she – the baby was tired, like it was just kind of tired. I mean she just kind of tired, but she was a little playful a little bit but she was kind of tired. I don't know if she had been out all day and - - you know because a lot of times when kids are up all day they're tired in the evening because they haven't gotten their naps." Dr. Jones testified the standard of care required that she do a work up on Lyric consisting of a chest x-ray, a CBC and a CMP, which was not done. Dr. Jones testified she ordered the CMP and the CMP test was pending because the hospital was having problems with the machine, yet the medical records indicate the test was cancelled. Dr. Jones claimed that although she wrote the order for the CMP, and she was the only physician on duty that night, she did not cancel it and it must have been cancelled by the lab department without notifying her. Further, although Lyric's medical records indicate Dr. Jones only examined Lyric one time, Dr. Jones claimed she did not write in the chart every time she saw or assessed Lyric. Dr. Jones testified the nurses told her they attempted to start an IV on Lyric multiple times, yet only one

18

attempt is noted in the chart. Dr. Jones claimed the nurses failed to chart the other attempts. Dr. Jones admitted she did not write an order to check Lyric's vital signs once she was admitted, but tried to justify the omission by explaining the respiratory therapists would routinely check the vitals because Lyric had a nebulizer treatment. When questioned why there were no such notations in the chart by the respiratory therapists, Dr. Jones claimed the vital signs were taken but not documented and she was verbally advised of Lyric's vitals. Dr. Jones denied the baby had vomiting in the hospital, but admitted Phenergan was given to the baby at 8:10 p.m. She denied giving the order for Phenergan and claims it was given by a nurse without her order, but the record indicates a verbal order by Dr. Jones for Phenergan. Moreover, the medical records indicate two episodes of Lyric vomiting/spitting up after she was admitted. Dr. Jones admitted she did not order IV fluids for Lyric, explaining that the baby was taking pedialyte in the ER and would suck on a Pedialyte bottle throughout her time at the hospital. However, the hospital records indicate Lyric had zero liquid intake during her hospitalization. Notably, Dr. Jones also denied the triage nurse asked her about transferring Lyric, although the nurse's concern is documented in the medical records.

It is undisputed that the standard of care simply required Dr. Jones to recognize Lyric presented to the emergency room as a sick baby and to transfer her to a higher level care facility. As confirmed by the unanimous opinion of the MRP and the testimony of Drs. Crowell, Gueringer, and Marino, the medical records undoubtedly support a finding that Lyric presented to the ER "quite ill." Lyric was documented as lethargic, wheezing, with a history of vomiting and rapid breathing, and a heart rate of 189. Although Drs. Litner and Breinholt opined Dr. Jones did not breach the standard of care, they also gave some testimony supporting a finding that Lyric presented to the ER very ill. Further, Dr. Jones' overall testimony was self-

serving and often inconsistent with the medical records.

Moreover, a finding that Lyric presented to the ER "quite ill" is also supported by the entry in the medical records from the triage nurse that she asked Dr. Jones at least three times if they could call another facility to take the baby. Although Dr. Jones attempts to discount the significance of this note by pointing out it was a late entry and the nurse was not called to testify, we find these facts to be of no consequence. There is no evidence in the record to suggest late entries in medical records are disallowed or unusual. Further, other than Dr. Jones' own biased testimony denying the event occurred, there is nothing in the record to support a finding that this entry was false or invalid. The medical experts who testified regarding this nurse's note found it to be highly material relative to Lyric's condition. Dr. Crowell specifically testified regarding this entry in Lyric's medical records:

> **Q: (Plaintiffs' counsel):** Now based on this annotation from the nurse in the medical records, what does that say to you?
>
> **A: (Dr. Crowell):** Again, having done this for 40 years nurses making comments to me about what's going on is very important to me. And if a nurse comes to me and repeatedly asked me "can't we send this baby somewhere else," that means something to me. And that meant something to me when I read this record when we reviewed the record.
>
> It meant something to all three of us and that - - the nurses are just uncomfortable keeping this baby in this hospital, they're uncomfortable continuing to try to manage the baby. There's absolutely no validity that I can - - that I know of for the comment that no one will take this baby without labs and having no fever.
>
> If I call Children's Hospital in New Orleans with a sick baby, they send - - they will come get that baby. I don't have to have labs, I don't have to have any tests, I don't have to have anything. I just need to say I've got a sick baby that I can't handle, come get him, and they will come get him or make an effort to come get him.
>
> I don't have to prove my case to justify calling for help. And that was a big issue for us in the Emergency Room. As ER doctors, our job is not to know what's going on in detail, we don't have to make the diagnosis. We just have to know that this is a sick person and I need to get them where they need to be to have the best chance of doing well. And that nurse is saying, please can't we send this baby somewhere else. That's

what I got out of the record. And this was not acted upon and that meant a lot to us when we reviewed this case.

Similarly, Dr. Marino testified:

> **Q (Plaintiffs' counsel):** ...One thing I wanted to ask you about the admit sheet...is where the nurse documents that she's asked Dr. Jones at least three times if she could transfer this baby. Does that have any significance for you?
>
> **A (Dr. Marino):** It has a very, very, very high significance for me. ... In having worked in an ICU now for almost 20 years, when a nurse comes up to me and says, I've got specific concerns about a patient, I take that very seriously. Because usually that means that a patient's status has changed. Well, my nurse many of whom have lots of years of critical experience like I do, is seeing something that's making them very concerned.
> So for a nurse, on three different occasions, in my opinion, to go to Dr. Jones and say, I think we should transfer this child elsewhere; her sixth sense was kicking in saying there's something wrong with this child and it's not just asthma, it's not just bronchiolitis, it's something much more significant.
>
> Nurses typically, because of the authority gradient between physicians and nurses, they don't like to do that. It's not their nature to go against the physician. Typically they'll do what the physician says to do. So for this nurse, on three different occasions, to go to this doctor and say, I think this child should be transferred, it says a lot.
>
> And typically, at least in my ICU and I'm sure emergency department's ICUs work very similarly, when I go and reevaluate that patient, when my nurses come to me and say I have concerns, nine times out of ten, they're right.

Dr. Gueringer agreed, testifying:

> **Q (Plaintiffs' counsel):** Now, Dr. Gueringer, the triage medical records indicates that nurse Gilman who was taking care of the baby in the Emergency Room asked Dr. Jones at least three times, "Can we transfer this baby." Does that signify anything to you?
>
> **A (Dr. Gueringer):** It would suggest to me that the nurses, one, recognized that the child was sick; and two, that they may very well have not been capable of handling the child at that facility.

Additionally, although it was undisputed that the standard of care did not require Dr. Jones to diagnose myocarditis, the experts and Dr. Jones gave substantial

21

testimony regarding myocarditis and its presentation and diagnosis. Given such testimony, we find the record supports the district court's reasoning that the jury was confused as to the standard of care.

Considering the entirety of the evidence and testimony presented at trial and given the district court's ability to evaluate the evidence and evaluate witness credibility in ruling on a motion for new trial under Article 1972(1), and the district court's much discretion in granting a new trial pursuant to Article 1973, we find no abuse of the district court's discretion in granting a new trial.

## CONCLUSION

For the above reasons, we affirm the ruling of the court of appeal setting aside the district court's grant of the JNOV. However, we reverse the ruling of the court of appeal relative to the new trial and we reinstate the district court's grant of the plaintiffs' motion for new trial.

## DECREE

**AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**

03/15/17

# SUPREME COURT OF LOUISIANA

## No. 2016-C-1232

## DAVID PITTS JR. AND KENYETTA GURLEY

## VERSUS

## LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY AND RHODA RENEE JONES, M.D.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,*
*FIRST CIRCUIT, PARISH OF TANGIPAHOA*

**WEIMER, J.**, concurring in part and dissenting in part.

While I concur in that portion of the majority opinion that affirms the court of appeal's ruling reversing the district court's grant of a judgment notwithstanding the verdict ("JNOV"), I respectfully dissent from the majority's conclusion that the district court did not abuse its discretion in granting a conditional new trial. Finding, on the basis of the differing opinions expressed by the medical experts, that the jury's verdict was supportable by any fair interpretation of the evidence, I would reverse the district court's grant of a conditional new trial and affirm the judgment of the court of appeal in its entirety.

At the outset, it must be acknowledged that this is truly a tragic case. However, our role as an appellate court is not to be swayed by emotion or compassion,[1] but to resolve the matters before us on the law and the facts as applied to that law. In this case, that law is well-settled. As reflected in the instructions received by the jury:

---

[1] In this regard, the district court's gratuitous characterization of Dr. Jones as "arrogant" and "grossly incompetent" in his written reasons adds little to the dispassionate discourse that is necessary in evaluating evidence. See **Pitts v. Louisiana Medical Mutual Insurance Company**, 16-1232, slip op. at 5 (La. 3/14/17).

The standard of care owed by a physician is not to exercise the highest degree of skill and care possible. ... The failure to obtain satisfactory results by a physician does not give rise to any presumption that there has been any malpractice on the part of the physician. The law does not require perfection in medical diagnosis and treatment. On the contrary, a physician's professional judgment and conduct must be evaluated in terms of reasonableness under the existing circumstances, and should not be viewed in hindsight and in terms of results or in light of subsequent events. ... A physician is not obligated in making a diagnosis to be correct all the time, and it is not malpractice to misdiagnose a patient's condition. ... What the law requires is that the assessment made by Dr. Jones be within the sphere of reasonably possible diagnoses that should have been made by other physicians under similar circumstances.

Armed with these instructions, a jury comprised of the peers of the parties heard the testimony, observed the witnesses, and came to a difficult decision. That decision should be respected. Unfortunately, there is sufficient evidence in the record to establish that Lyric died from a rare and often fatal heart condition that masquerades as an upper respiratory or gastrointestinal disease and is not reasonably detectable until after death, through an autopsy.

The issue with which this court must grapple is whether a new trial should be granted on the particular facts and circumstances of this case. As the majority recognizes, a new trial may be granted on peremptory, La. C.C.P. art. 1972, or discretionary, La. C.C.P. art. 1973, grounds. In this case, the district court did not specify on which of the grounds–peremptory or discretionary–the court relied in granting the conditional new trial; rather, "the district court provided essentially the same reasons for granting the JNOV and conditionally granting the new trial." **Pitts v. Louisiana Medical Mutual Insurance Company**, 16-1232, slip op. at 9 (La. 3/14/17). Those reasons reflect the district court's assessment that the jury verdict "is **so far contrary to the law and the evidence that it offends the conscience** (certainly of the undersigned) **and presents a clear injustice that must be**

2

**remedied.**" *Id.* Giving the broadest possible construction to these reasons, it is likely, as the majority concludes, that the district court found a new trial warranted under both the peremptory ground of La. C.C.P. art. 1972(1) ("[w]hen the verdict ... appears clearly contrary to the law and the evidence") and the discretionary ground of La. C.C.P. art. 1973 (when "there is good ground therefor").

Although the district court has wide discretion to grant or deny a motion for new trial on either of these grounds, this court has repeatedly cautioned that this discretion is not unlimited:

> The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility.

**Martin v. Heritage Manor South**, 00-1023, p. 3 (La. 4/3/01), 784 So.2d 627, 630 (quoting **Gibson v. Bossier City General Hospital**, 594 So.2d 1332, 1336 (La.App. 2 Cir. 1991). This is particularly true when the ground asserted for granting a new trial is that the verdict appears contrary to the evidence:

> *A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light. Thus, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence.*

**Martin**, 00-1023 at 3, 784 So.2d at 630-31 (quoting and adding emphasis to **Gibson**, 594 So.2d at 1336).

In this case, the district court itself acknowledged during the hearing on the motions for JNOV and a new trial that, while he would have decided the case differently, this is in fact a case in which the jury verdict is supportable by a fair

3

interpretation of the evidence. Commenting on the standard for granting a JNOV, the district court candidly admitted: "And yet, the defense put on expert witnesses who gave opinions that the standard was not breached and that because of that–I mean, I think you see my point. If the jury believed, for whatever reason, those witnesses, whom I can tell you I did not believe, they had something to hang their hat on."

The majority opinion does not disagree with this conclusion, adopting in full the court of appeal's determination that "[g]iven the considerable disagreement among the medical experts, a reasonable person could have concluded that the plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones by a preponderance of the evidence presented at trial." **Pitts**, slip op. at 8 (quoting **Pitts v. Louisiana Medical Mutual Insurance Company**, 15-0848, p. 18 (La.App. 1 Cir. 6/3/16), 197 So.3d 221, 235). Nevertheless, despite acknowledging that (1) the standard for a new trial under La. C.C.P. art. 1972(1) directs that the reviewing court determine whether the jury's verdict is supportable by any fair interpretation of the evidence, **Pitts**, slip op. at 10, and (2) given the differing opinions voiced by the medical experts, reasonable persons could have concluded that plaintiffs did not establish a breach of the standard of care applicable to Dr. Jones, **Pitts**, slip op. at 8, the majority finds no abuse of discretion in the district court's grant of a conditional new trial. However, it does so after examining only the trial testimony *favorable* to the plaintiffs, without examining, and basically dismissing, the considerable testimony to the contrary on which a reasonable juror could have relied in reaching the verdict in this case. For example, the majority opines:

> It is undisputed that the standard of care simply required Dr. Jones to recognize Lyric presented to the emergency room as a sick baby and to transfer her to a higher level care facility. As confirmed

4

by the unanimous opinion of the MRP[2] and the testimony of Drs. Crowell, Gueringer and Marino, the medical records undoubtedly support a finding that Lyric presented to the ER "quite ill."

**Pitts**, slip op. at 19.   This conclusion ignores significant testimony which undercuts that of the plaintiffs' experts, *including testimony from the plaintiffs' experts themselves*.

Dr. Crowell, plaintiffs' first expert to testify, was one of three members of the medical review panel ("MRP") who reviewed the case.   While Dr. Crowell based his opinion (and that of the MRP) on evidence indicating that on arriving at the emergency room, Lyric was lethargic, tachycardic (displaying an elevated heart rate) and tachypneic (having difficulty breathing), on cross-examination, he admitted that Lyric's heart rate of 189 (which was never exceeded during the entire course of her treatment), while at the upper range of normal, was not something that would "raise a red flag."   See **Pitts**, 15-0848 at 11, 197 So.3d at 230.   Her oxygen saturation level, which was always above 95 percent, was admittedly "quite adequate."   *Id.* And, while Dr. Crowell initially attributed the "adequate" oxygen saturation level to the work Lyric was exerting in trying to breathe, after reviewing the nursing notes indicating that Lyric had no nasal flaring, had even and unlabored breathing, and showed no signs of acute distress, Dr. Crowell admitted that the nursing notes "suggest[ed] nothing untoward" going on, showed "no unusual work of breathing," and demonstrated none of the rapid decompensation that had been discussed in the MRP's opinion.   *Id.*, 15-0848 at 11-12, 197 So.3d at 230.   Dr. Crowell further acknowledged that Lyric's documented respiratory rates were within normal range

---

2   It should be noted that while the medical review panel opined that Dr. Jones failed to meet the appropriate standard of care, it could not determine if any breach was a factor in Lyric's demise. The MRP opinion states: "The panel cannot determine what role these breaches in the standard of care played in the child's demise."   **Pitts**, 15-0848 at 11, 197 So.3d at 230.

5

the entire time she remained in the emergency room. Significantly, as the court of appeal notes in its opinion:

> Asked whether other emergency medicine physicians may disagree with him regarding whether Dr. Jones breached the standard of care in treating Lyric, Dr. Crowell responded, "Oh, absolutely, we can disagree on anything." Dr. Crowell added, "**[another physician] may understand what the standard of care is, he may just decide from looking at the records that [Dr. Jones] didn't breach it.**"

**Pitts**, 15-0848 at 12, 197 So.3d at 230 (emphasis added).

Similarly, Dr. Gueringer, another member of the medical review panel, was called to testify as an expert for plaintiffs. Dr. Gueringer's testimony overlapped with much of the testimony offered by Dr. Crowell. Dr. Gueringer testified that when she presented to the hospital, Lyric's respiratory and heart rates were arguably within normal range. He elaborated, explaining that Lyric's temperature, pulse or heart rate, oxygen saturation levels, respiratory rate, and blood pressure–at least until 2 a.m.–did not present "the picture of an abnormal seven-month-old infant." **Pitts**, 15-0848 at 12, 197 So.3d at 231. In fact, he acknowledged that until 2 a.m., all of Lyric's vital signs were normal, consistent, and not at all representative of the rapid decompensation found by the MRP members. Most significantly, Dr. Gueringer concurred with Dr. Crowell's position that **other emergency medicine physicians might disagree with his conclusions in this case**.

Finally, Dr. Marino was called by the plaintiffs to testify as an expert, not in emergency medicine, but in pediatrics, pediatric cardiology, and pediatric critical care medicine. On direct examination, Dr. Marino testified that Lyric's vital signs were abnormal, and should have prompted Dr. Jones to call for her transfer to a hospital that could provide a higher level of care. However, his testimony to this effect was based on his opinion that the maximum normal heart rate for a seven-

6

month-old baby is 169. Dr. Marino reviewed Lyric's recorded heart rates of 189, 187, 187, and 180 and opined that they were all abnormally elevated because they were over 169. On cross-examination, however, Dr. Marino was presented with excerpts from the Pediatric Advanced Life Support ("PALS") manual, **which he authored**, which indicates that the normal heart rate for an infant between three months and two years of age is 100 to190. In other words, according to the manual Dr. Marino himself wrote, Lyric's heart rate was normal at all relevant times. Dr. Marino's testimony was thus contradicted by his own manual, considered to be the national standard. Further, when asked about the opinions of plaintiffs' experts, Drs. Crowell and Gueringer, that Lyric's vital signs were within normal ranges, Dr. Marino stated, " **I would not expect these emergency physicians to know the subtleties of a heart rate of [130] to [160] or [180]**," thereby directly undermining his earlier criticism of Dr. Jones for not recognizing what he perceived to be abnormal pediatric vital signs. **Pitts**, 15-0848 at 15, 197 So.3d at 232-33.

If reasonable experts in emergency medicine might not be expected to recognize, based on her vital signs, that Lyric presented to the emergency room as a "quite ill" child (per Dr. Marino), or might disagree with the conclusions of plaintiffs' experts that Dr. Jones breached the applicable standard of care (per Drs. Crowell and Gueringer), then, certainly, the district court's grant of a new trial on the ground that the verdict is clearly contrary to the evidence is an abuse of discretion. This is true without even considering the testimony of defendants' experts, but a cursory review of that testimony underscores that, as the district court noted, the jury "had something to hang their hat on."

In fact, Dr. Litner, who testified for defendants as an expert in emergency medicine, opined that Dr. Jones fully complied with the appropriate standard of care.

7

He disagreed with the opinion of the MRP,[3] pointing out that the panel's characterization of Lyric as "significantly tachycardic and tachypneic" was not supported by her actual vital signs. **Pitts**, 15-0848 at 16, 197 So.3d at 233. He disagreed with the panel's opinion that Lyric was "quite ill" on presentation and that Dr. Jones failed to recognize the seriousness of her condition, and he disagreed with the opinion that Lyric should have been transferred to another facility, explaining that based on how she presented, she could have been managed in a community hospital.

Dr. Breinholt, a pediatrician and pediatric cardiologist, likewise testified as an expert witness for defendants. He testified that upon presentation in the emergency room, Lyric looked like a child with a typical respiratory illness like bronchiolitis, reactive airway disease or asthma, and not like a child with a cardiac problem. He indicated there was no evidence in Lyric's medical records that would have warranted or mandated that she be transferred to another facility.

While the majority seems to place a great deal of emphasis on the late added entry to Lyric's medical records by a nurse, which suggests that Dr. Jones was asked at least three times if another facility should be called, the fact is that much about this entry was disputed. Dr. Jones testified she never saw the entry, nor was she ever asked by a nurse to transfer Lyric to another facility for treatment. She explained that she has respect for nurses. She stated that as a physician, she believes

---

[3] The law is clear, and the majority does not dispute, that the opinion of the MRP, even a unanimous one, is not unassailable. See La. R.S. 40:1231.8(H) (formerly La. R.S. 40:1299.47(H)) ("Any report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant in a court of law, but such expert opinion shall not be conclusive and either party shall have the right to call, at his cost, any member of the medical review panel as a witness."). See also **Samaha v. Rau**, 07-1726, p. 15 (La. 2/26/08), 977 So.2d 880, 890 ("As with any other expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing view point.").

she is part of a team and that she would have at least considered the idea of a transfer if a nurse had suggested it. The nurse who is reported to have made the entry was not called to testify and, in fact, the only witness who testified to the events of that day was Dr. Jones.[4] Given that Dr. Jones was the only fact witness to testify, it was not unreasonable, as the majority suggests, for the jury to have given weight to her testimony. The fact that Dr. Jones disputed that a suggestion to transfer Lyric was made in her presence does not render her testimony in that regard incredible.

In the final analysis, the jury verdict in this case was based on the testimonies of several highly qualified experts, including Drs. Litner and Breinholt. The jury's decision to credit the opinion of those experts was supported by the testimony of plaintiffs' own experts, Drs. Crowell and Gueringer, who acknowledged that it is reasonable for experts to disagree as to whether Dr. Jones breached the applicable standard of care in this case. And, it was further supported by Dr. Marino's admission that he would not expect emergency room physicians to understand the subtleties of an abnormal heart rate in a child Lyric's age. The jury's verdict in this case was clearly based on a fair interpretation of the evidence and, while the district court was free to draw his own inferences and conclusions from the evidence and to evaluate witness credibility to determine whether the jury erred in giving too much credit to an unreliable witness, the court was not free to interfere with the jury verdict simply because the court disagreed with it. To the extent the district court's grant of a conditional new trial was based on the court's conclusion that the jury verdict "is so far contrary to the law and the evidence that it offends the conscience (certainly

---

[4] The failure of the plaintiffs to call the nurse to testify did not go unobserved. Even the district court was perplexed as to why the nurse was not called. In a bench conference, the judge queried: "Am I ever going to know what happened to that nurse? I'm just dying with curiosity."

9

of the undersigned),"[5] that ruling was an abuse of discretion. A fair interpretation of the evidence does not support the district court's finding that a new trial is warranted under La. C.C.P. art. 1972(1).

Of course, as the majority recognizes, the district court also has authority to grant a new trial on the discretionary grounds of La. C.C.P. art. 1973. However, and also as recognized by the majority, while a district court has much discretion to grant a new trial when the court is convinced that a miscarriage of justice has occurred, the district court is nevertheless required to state an articulable reason as to why he is exercising his discretionary power. **Pitts**, slip op. at 10-11, citing **Horton v. Mayeaux**, 05-1704 (La. 5/30/06), 931 So.2d 338, 344.

In this case, as the majority acknowledges, the same reasons that prompted the district court to grant the JNOV prompted him to grant the conditional new trial. According to the district court:

> No reasonable jury could have found otherwise than as stated herein. I belief (sic) the jury was confused by the testimony of the defense experts and applied the wrong standard of care to the defendant. Further, even if the scant defense evidence of record does not support a reversal of the jury verdict, it is so far contrary to the law and the evidence that it offends the conscience (certainly of the undersigned) and presents a clear injustice that must be remedied. ...

**Pitts**, slip op. at 6.

Reduced to its essentials, the only reason cited by the district court for the grant of a conditional new trial is its disagreement with the evidence and the manner in which the jury evaluated that evidence. Tellingly, there is no explanation from the district court as to why the court was convinced the jury was confused by the defense experts as to the applicable standard of care, other than the district court's

---

[5] See **Pitts**, slip op. at 6.

10

belief that because the jury credited the defense testimony, it must have been confused. Thus, this is not a case like **Horton**, where the district court granted a new trial on the discretionary grounds of La. C.C.P. art. 1973 because it was concerned about a failing on its own part to conduct the trial in a manner that assured that justice had been done.[6] Rather, in this case, the district court simply failed to articulate a ground for the granting of a new trial other than its disagreement with the jury's verdict. This is not the "good ground" for interfering with the jury's verdict that is contemplated by La. C.C.P. art. 1973. As this court has cautioned, "[a] conditional grant of a new trial is not to be used to give the losing party a second bite at the apple without facts supporting a miscarriage of justice that would otherwise occur." **Joseph v. Broussard Rice Mill, Inc.**, 00-0628, p. 15 (La. 10/30/00), 772 So.2d 94, 105. No such facts appear in the record of this case.

Based on the facts in this case, I find no peremptory or discretionary grounds on which the district court could have based its conditional grant of a new trial. As a result, I would affirm the court of appeal opinion in its entirety.

---

[6] In **Horton**, the district court expressed concern with its repeated admonishments to counsel to hurry and finish the case because of the late hour and further opined that the jury had been "pushed to the max." **Horton**, 05-1704 at 10, 931 So.2d at 344.

11

SUPREME COURT OF LOUISIANA

No. 2016-C-1232

DAVID PITTS JR. AND KENYETTA GURLEY

VERSUS

LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY
AND RHODA RENEE JONES, M.D.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF TANGIPAHOA

**GUIDRY, Justice, concurs and assigns reasons.**

I concur in the majority decision today, and write separately to draw attention to the majority's correct statement regarding the discretionary authority of the trial court to order a new trial under La. C.C.P. art. 1973: while a trial court has much discretion in denying or granting a new trial, it must state an articulable reason or reasons supporting the exercise of its discretionary powers. Under La. C.C.P. art. 1973, the trial court is granted the discretionary authority to order a new trial "in any case if there is good ground therefor, except as otherwise provided by law." As the majority explains, a new trial may be ordered pursuant to La. C.C.P. art. 1973 when the trial judge is convinced by his examination of the facts that the judgment would result in a miscarriage of justice. *Ante*, p. 9 (citing *Horton v. Mayeaux*, 05-1704 (La. 5/30/06), 931 So. 2d 338, 344; *Lamb v. Lamb*, 430 So. 2d 51, 53 (La. 1983)).

Recently, this court suggested the trial court has "virtually unlimited discretion to grant a new trial…." *See Horton*, 05-1704, p. 10, 931 So.2d at 344 ("when a district court is convinced that a miscarriage of justice has occurred, it has virtually unlimited discretion to grant a new trial, and unless an abuse of

1

discretion can be demonstrated, a trial court's action in granting or denying a new trial on discretionary grounds will not be reversed.")(internal citations and quotations removed). But the *Horton* court relied on decisions of the courts of appeal using this phrase. *See Johnson v. Missouri Pac. R.R. Co.*, 2000-0980, p. 5 (La. App. 3 Cir. 7/25/01), 792 So.2d 892, 896 ("A trial court has virtually unlimited discretion to grant a new trial when it is convinced that a miscarriage of justice has resulted . . . ."); *Capitol Nursing Home, Inc. v. Nixon*, 1999-0378, p. 6 (La. App. 1 Cir. 3/31/00), 764 So.2d 1016, 1019 ("A trial court has virtually unlimited discretion to grant a new trial when it is convinced that a miscarriage of justice has resulted . . . ."). These two cases had in turn cited another appellate decision, *Heritage Worldwide, Inc. v. Jimmy Swaggart Ministries*, 95-0484, p. 3 (La. App. 1 Cir. 11/16/95), 665 So.2d 523, 526 ("A trial court has virtually unlimited discretion to grant a new trial when it is convinced that a miscarriage of justice has resulted . . . .").

Although the majority opinion cites *Horton*, it correctly, in my view, relies on language in the Official Revision Comments to Code of Civil Procedure Articles 1971 through 1973, and this court's prior decision in *Lamb*, when it states: "this court has recognized that the district court has much discretion in determining whether a new trial should be granted pursuant to Article 1973. *Lamb*, 430 So. 2d at 53; *see also* La. C.C.P. art. 1971, Official Comment (d)." *Ante*, p. 10.

Subsection (d) of the Official Revision Comments to Arts. 1971 Through 1973--1960 provides as follows (emphasis added):

> (d) Art. 560 of the 1870 Code lists the peremptory grounds for new trial. Art. 558 sets forth a discretionary provision for granting new trial. This Code adopts a similar form of presentation by providing for peremptory grounds in Art. 1972, infra, and the discretionary provision in Art. 1973, infra.

Although the trial judge has ***much discretion*** regarding applications for new trial, in a case of manifest abuse the appellate court will not hesitate to set the trial court's ruling aside, or grant a new trial when timely applied for. *Succession of Robinson*, 186 La. 389, 172 So. 429 (1937) *Cf. Elchinger v. Lacroix*, 192 La. 908, 189 So. 572 (1939); *Weinberger Sales Co. v. Truett*, 2 So.2d 699 (La. App.1941).

In *Lamb*, after the trial court denied a motion for new trial and the court of appeal affirmed, the court found the trial court had abused its discretion under La. C.C.P. art. 1973 by failing to grant a new trial. *Id.* at 51. To describe the trial court's discretion, the *Lamb* opinion stated:

We have recognized that the court has ***much discretion*** regarding this determination. However, this court will not hesitate to set aside the ruling of the trial judge in a case of manifest abuse."

*Id.* at 53 (emphasis added). The *Lamb* court cited the Official Revision Comments to Article 1971-1973, as well as two Supreme Court cases, none of which used the phrase "unlimited discretion." Further, at least one commentator, citing *Lamb*, has recognized that "[e]ven when none of the peremptory grounds for new trial exists, the judge nevertheless has 'wide' discretion to grant a new trial." Frank L. Maraist, *New trial: requisites*, 1 LA. CIV. L. TREATISE, CIVIL PROCEDURE § 13:2 (2d ed.).

In sum, then, I agree with the majority's statement that this court reviews the ruling of the district court on a motion for new trial under La. C.C.P. art. 1973 to determine whether the district court has abused its much discretion in granting or denying a motion for new trial. The trial court must state an articulable reason or reasons as to why it is exercising its discretionary powers, or in the words of La. C.C.P. art. 1973, "a good ground therefor…." The trial court's action in granting or denying a new trial on discretionary grounds will not be overturned unless an abuse of discretion can be demonstrated. *See Ante*, pp. 10-11.

Although I agree with the majority's statement of the law, I would go further and overrule *Horton v. Mayeaux* to the extent that it incorrectly provides that a trial court has "virtually unlimited discretion to grant a new trial." *See Horton*, 05-1704, 931 So. 2d at 344. In my view, that phrase in *Horton*, given its uncertain origins, promotes confusion, is inconsistent with La. C.C.P. art 1973, and is, frankly, an incorrect statement of the law. In my view, the court should have taken this opportunity to remove that unfortunate phrase from our jurisprudence.

Nevertheless, with the correct standard of review in mind, I concur in the majority's determination that the district court here, under these particular facts, did not abuse its much discretion in granting a new trial under La. C.C.P. art. 1973, although the margin was extremely close.

SUPREME COURT OF LOUISIANA

No. 2016-C-1232

DAVID PITTS JR. AND KENYETTA GURLEY

VERSUS

LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY
AND RHODA RENEE JONES, M.D.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF TANGIPAHOA

**Clark, Justice, concurring in part and dissenting in part.**

I respectfully concur in part and dissent in part for the reasons assigned by Justice Weimer.

**SUPREME COURT OF LOUISIANA**

**No. 2016-C-1232**

**DAVID PITTS JR. AND KENYETTA GURLEY**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY
AND RHODA RENEE JONES, M.D.**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF TANGIPAHOA**

**CRICHTON, J., additionally concurs for the reasons assigned by Justice Guidry.**